[Cite as *State v. Minor*, 2024-Ohio-1465.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## COLUMBIANA COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

RANDOLPH P.C. MINOR,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 23 CO 0027**

---

Criminal Appeal from the
Court of Common Pleas of Columbiana County, Ohio
Case No. 2022 CR 297

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Judges and
William A. Klatt, Retired Judge of the Tenth District Court of Appeals,
Sitting by Assignment.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Vito J. Abruzzino,* Prosecuting Attorney, *Atty. Shelley M. Pratt*, Assistant Prosecuting Attorney, Columbiana County Prosecutor's Office*,* for Plaintiff-Appellee and

*Atty. James R. Wise*, for Defendant-Appellant

Dated:  April 15, 2024

**Robb, P.J.**

{¶1} Defendant-Appellant Randolph P.C. Minor appeals after being convicted of multiple sex offenses in the Columbiana County Common Pleas Court. He alleges the state did not sufficiently authenticate a video of the child-victim's interview at the hospital before playing it for the jury. He also contends his confrontation clause rights were violated, claiming the video contained testimonial evidence because some statements were generated with a primary purpose of investigation instead of medical diagnosis or treatment. For the following reasons, Appellant's convictions are affirmed.

STATEMENT OF THE CASE

{¶2} Appellant was indicted on three counts of rape, one count of attempted rape, and one count of gross sexual imposition, starting when the child was 11 and continuing until the month after she turned 12 years old. *See* R.C. 2919.22(A)(1)(b) (rape by sexual conduct with a child under 13 years of age); R.C. 2907.05(A)(4) (gross sexual imposition by sexual contact with a child under 13 years of age). At the jury trial, the victim testified Appellant was her mother's boyfriend, whom she initially trusted. She said she was 11 years old when Appellant moved into the trailer where she lived with her mother and siblings (Tr. 300). The children were left alone with him when the mother worked in the evenings. (Tr. 302).

{¶3} Within weeks of moving in, Appellant started sexually assaulting the victim. Initially, she was in her mother's bed watching television with her younger sister when Appellant touched her vagina through her clothing; he then did it again after bringing her to the living room couch. (Tr. 304-305). He would also watch her shower. (Tr. 306). Another time, Appellant pulled the victim's pants down while she was on her mother's bed and put his mouth on her vagina. She testified her sister walked in during this act. (Tr. 306, 312).

{¶4} In addition, Appellant would play a game where he would turn off the lights, act scary, and chase the children around the house. During the game, he would pull the victim into a closet, take her pants down, and put his mouth on her vagina. (Tr. 306-308).

Case No. 23 CO 0027

If another child entered the room, Appellant would jump out of the closet and scare them. (Tr. 307). Sometimes, the victim's mother was in the house during the game. (Tr. 326).

{¶5} During another incident, Appellant took his penis out while the victim was in her mother's bed, rubbed his penis on her clothed private area, and made the victim put her mouth on his penis. (Tr. 309). When asked if Appellant ever did anything else with his penis, the victim testified, "He has attempted putting it inside, but he said it wasn't going to work." On being asked to clarify where he was trying to put his penis, she said, "My vagina." (Tr. 310).

{¶6} At some point, the victim approached Appellant to beg him to discontinue the sexual behavior. Appellant told the victim her mother would be mad at her and would not believe her; he also said he would stop speaking to her and she would never see his daughter again. (Tr. 309, 320). She said this made her feel hurt and scared. Appellant also mentioned that he had a gun in the closet. (Tr. 319).

{¶7} One day, Appellant chased the children around the house with duct tape. The victim said he previously duct-taped her arms and legs for approximately three minutes as punishment while her mother was home. During this prior restraint, he laid on top of her, and she started having a claustrophobic panic attack and kicked him. Fearing he would use the tape to bind her again, the victim hid in the doghouse behind the trailer. Her sister found her and successfully encouraged the victim to tell Appellant's daughter about the sexual abuse she had been suffering. (Tr. 314-316). On learning of the disclosure, the victim's mother rushed home from work and decided to bring the victim into the house to confront Appellant. Appellant called the victim a liar. (Tr. 317). The next day, the victim went to the police station with her mother. (Tr. 318).

{¶8} Two days later, she told her teacher and the school counselor about the situation. (Tr. 230, 249, 256, 318-319). Several days later, she was examined at the Child Advocacy Center (CAC) at Akron Children's Hospital in Boardman, where she repeated her disclosures. (Tr. 261, 319, 323).

{¶9} The victim testified her mother continued to have a relationship with Appellant, which made her feel hurt, as if her mother did not believe her, as Appellant predicted. (Tr. 321). Her mother then got pregnant and gave birth to a baby, which the victim believed was Appellant's child. (Tr. 322).

{¶10} The victim's sister, who was a year younger than the victim, confirmed Appellant would supervise them while their mother was at work. (Tr. 353). She testified she once walked into her mother's bedroom to find the victim trying to get up from the bed while Appellant was pulling her down from under the covers. The lights and television were off. One of them claimed they were wrestling over the remote control, but the sister felt the situation was suspicious, noting she would often "catch" them alone together. (Tr. 341-342).

{¶11} The sister confirmed the victim eventually told her Appellant was touching her inappropriately. The victim worried it could happen to her siblings if she stopped and asked whether she should tell her mother or continue "doing things" with Appellant. This younger sister testified she advised the victim to continue with him so their mother would not be mad. (Tr. 343-344). The sister then testified about the time when she followed the crying victim as she "stormed out of the house" to hide in the doghouse after a "lights off" game was started. At that time, the sister advised the victim to tell Appellant's daughter about Appellant touching her, and the victim then did so. (Tr. 345, 357).

{¶12} The school guidance counselor confirmed speaking to the victim after she made disclosures to a teacher about Appellant. The victim appeared to be very afraid of Appellant. (Tr. 228-241).

{¶13} The chief of the local police department testified he was dispatched to the victim's house two days before the guidance counselor reported the abuse. The victim and her mother accompanied him to the police station. He explained the interview was brief because children are not benefitted by being subjected to police questioning when CAC had trained experts to conduct the interview. (Tr. 256-258). He watched the CAC interview through a one-way mirror. (Tr. 261-262).

{¶14} Appellant consented to be interviewed by the police chief. Appellant said he played a game called "Lights out" where he had a knife and hunted the children by chasing them while the lights were off and then stop when the lights were turned on. (Tr. 265). Appellant also admitted restraining the victim and his daughter with duct tape. (Tr. 266-267). He acknowledged the victim saw him naked twice, claiming she entered the bathroom while he was in the shower. (Tr. 268). Appellant told the chief the victim's

mother created the sexual assault story because she wanted to break up with him so she could get back with the victim's father. (Tr. 267).

**{¶15}** Testimony was also presented by the medical director of CAC's child abuse unit. He was qualified as an expert on child abuse and neglect. He spoke about grooming, the effects of abuse on a child, and delayed disclosure. (Tr. 367-370, 385-386). He explained how physical signs of sexual assault are found in 10% or less in cases of children who were sexually abused, pointing to the varying assault types, the passing of time, the elasticity of the tissue, and the healing abilities of mucosal areas. He cited a study on pregnant victims with no physical signs of penetration; he also referred to the multitude of cases where offenders confess to raping victims who had no penetration indicators. (Tr. 371-373, 388).

**{¶16}** During the medical director's testimony, the video of the child's CAC interview was played for the jury. (St.Ex. 3). The medical director then testified the victim provided a "clear narrative of the abuse" and was able to clarify occurrences based on the social worker's open-ended questions, which allowed the victim to add more detail than originally relayed, including sensory motor details. (Tr. 382-385). He opined the child was a victim of sexual abuse and agreed with the examining doctor's label of the case as "highly concerning" for sexual abuse. (Tr. 389, 391-392).

**{¶17}** Appellant testified in his own defense. He acknowledged moving into the trailer with the victim's mother and her four children. He initially said the victim's mother only worked as a bartender four times a month but later mentioned she had another job. (Tr. 417-418, 430-431, 439). Although he testified the victim's mother used her mother or brother to watch the children when she worked, he acknowledged telling the sheriff he always had the kids when she was working. (Tr. 417-418, 441). Appellant testified he put a lock on the bedroom door because the victim hid behind clothes racks and watched while he had sex with her mother on six different occasions. He also said the children would walk in on him having sex with their mother in the bathroom or peek under the door while they were doing so. (Tr. 424-46).

**{¶18}** He testified the games he played were made up by the children, claiming the Lights Out game was a result of the victim's four-year-old brother saying he wanted to grow up to be a serial killer (while Appellant discussed with him which horror movie

killer he preferred). (Tr. 420-421). Appellant acknowledged chasing the children with the mother's plastic kitchen knife but said it was sheathed. (Tr. 421). He then testified he only carried around the sheath during the game. (Tr. 442-443). He acknowledged telling the police he threw the victim on the bed and pretended to bite her while playing a vampire game. (Tr. 451-452). As to using tape on the children, he said the victim's mother was playing a game with the children using packing tape while the children were huddled up and laughing; he participated by trying to tape his daughter but she was too strong. (Tr. 422-423, 443-444).

**{¶19}** The jury found Appellant guilty of the five sex offenses. The trial court sentenced Appellant to consecutive sentences of ten years to life for each rape, eight years for attempted rape, and sixty months for gross sexual imposition. (4/27/23 J.E.).

**{¶20}** The within timely appeal followed. Appellant sets forth a general assignment of error contesting the admission of the video interview of the child at CAC with two distinct sub-assignments of error.

SUB-ASSIGNMENT OF ERROR ONE

**{¶21}** Appellant's assignment of error, in conjunction with his first sub-assignment of error, initially contends:

"The Trial Court erred in admitting the video statement of the victim into evidence[.] A) The exhibit was not properly authenticated prior to its admission and shown to the jury * * *."

**{¶22}** Before jury selection, the prosecutor asked the court for a ruling on the state's motion in limine seeking admission of the child's videotaped interview at CAC. The prosecutor said the interview fell under the medical diagnosis hearsay exception, pointing to the law cited in the state's motion on the topic. (Tr. 7-8). Defense counsel generally objected while acknowledging his awareness of the case law. (Tr. 9). The court opined the case law supported the admission of the video as a hearsay exception and preliminarily overruled the defense's objection, noting it could be renewed if the video was offered during trial. (Tr. 9-10).

**{¶23}** During the trial, the victim testified she was interviewed one time at CAC. (Tr. 325). The chief of police, who watched the CAC interview from behind one-way glass as it occurred, identified a photograph of the child from the time of the initial report.

Testimony was then presented by the medical director at CAC, who was an expert in child abuse as well as a representative of the Akron Children's Hospital and the supervisor of the examining physician.

**{¶24}** The medical director explained the hospital's CAC was a trauma-informed clinic for medical examination of children suspected to be victims of abuse; he emphasized the primary purpose of the clinic was medical diagnosis and management. (Tr. 364-365). Upon receiving a referral from law enforcement or a children services agency, CAC schedules an appointment for the child. The goal is to provide a family-oriented environment for evaluation so the child is not detrimentally subjected to the trauma of multiple interviews at multiple locations; this is in the alternative to in-depth questioning successively occurring at the police station, at a children services agency, at a hospital (by a nurse, social worker, and doctor), and at a personal pediatrician's office, which can result in the child or their family being "retraumatized." (Tr. 366-367).

**{¶25}** The medical director said the intake interview is conducted by the CAC social worker with medical personnel watching; representatives from law enforcement and children services also typically watch the interview in real time through a live feed and/or one-way glass. (Tr. 262, 374). The interviewing social worker has "specialized training in how to communicate with children in a way that is age-appropriate, developmentally-appropriate, trauma-informed, and that minimizes any sort of suggestibility or any sort of leading questions." (Tr. 375-376). After the victim is interviewed by the social worker, the medical examination is conducted.

**{¶26}** The medical director explained he was the supervisor of the examining doctor, who had since moved to California. (Tr. 373). The records reviewed by the medical director included the written report of the CAC social worker, the medical report written by the examining doctor, and the video of the physical exam. (Tr. 374). When asked if he also watched the video of the social worker's interview, the medical director said, "So when I review medical records, I sometimes review the video recording, and sometimes I don't. In this case, I definitely reviewed the written documents, which summarized the video recording." (Tr. 376-377).

**{¶27}** Before the video of the victim's intake interview was played at trial, the medical director testified all CAC records are kept as part of the patient records

maintained by Akron Children's Hospital. (Tr. 365, 373); (St.Ex. 3). This includes the social worker's interview of the child, which is maintained on the hospital's computer server as video recording. (Tr. 376-377). Furthering the purpose of avoiding multiple interviews, the video of the interview is provided to law enforcement when requested if releases are signed; the medical director believed the interview video was provided to law enforcement in this case. (Tr. 377-378). The medical director answered in the affirmative when asked if the hospital records accurately depicted the video recording as prepared on the date of the interview. (Tr. 377).

{¶28} When the state offered the video into evidence, defense counsel generally renewed the objection he made before trial. The court overruled the objection and opined a proper foundation had been laid. (Tr. 378). The video of the child-victim's interview was then played for the jury.

{¶29} Appellant argues the video was not properly authenticated under Evid.R. 901(A). He complains the witness the state used to authenticate the video was not present when it was made and did not seem to have watched the video until it was played at trial. He construes the testimony as indicating the medical director reviewed the summaries of hospital staff members who watched the interview. Although the chief of police had already testified he watched the child's interview live, Appellant points out the state did not ask the chief to authenticate the video. Appellant then says even if the medical director did watch the video from the hospital's records before trial, he did not properly authenticate it by specifically testifying the exhibit was the video from the hospital's system or was produced with a reliable recording system.

{¶30} If the video of the victim's interview was unauthenticated and thus should not have been played at trial, Appellant argues the medical director would not have been able to opine the child provided a "very clear narrative of the abuse that occurred." (Tr. 382). We note the chief of police already testified the child provided specific details about the sexual assaults during the interview, which he watched live. (Tr. 261-263).

{¶31} Evid.R. 901(A) provides: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Authentication "is a matter of relevancy conditioned on a preliminary determination of

fact." Staff Note to Evid.R. 901(A). The rule provides a non-exhaustive list of "examples of authentication or identification" methods for purposes "of illustration only, and not by way of limitation * * *." Evid.R. 901(B). The first example reads as follows: "Testimony of Witness With Knowledge. Testimony that a matter is what it is claimed to be." Evid.R. 901(B)(1).

{¶32} Another example shows authentication can also occur through the presentation of "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Evid.R. 901(B)(9). This example "does not foreclose the taking of judicial notice of the accuracy of the process or system." Staff Note to Evid.R. 901(B)(9) (suggesting this example is more relevant when the case involves a "sophisticated process or system").

{¶33} Appellant cites case law addressing two authentication theories. First, the "pictorial testimony" theory involves admitting a video to illustrate a witness's testimony after it is authenticated by a witness's personal observation that it is an accurate representation. Second, the "silent witness" theory involves a video speaking for itself as substantive evidence of what it portrays after a witness testifies to its production (regardless of their presence during its making). *See State v. Green*, 7th Dist. Mahoning No. 12 MA 226, 2014-Ohio-648, ¶ 12-14, citing *Midland Steel Prods. Co. v. U.A.W. Local 486*, 61 Ohio St.3d 121, 129-130, 753 N.E.2d 98 (1991). He notes silent witness authentication typically involves "proof of the reliability of the video recording system, proof of the custody of the video recording, a showing that the evidence has not been altered, and that the video being shown is from the camera system being described." *State v. Haywood*, 7th Dist. Columbiana No. 21 CO 0035, 2023-Ohio-1121, ¶ 54.

{¶34} However, "It is not necessary that the individual authenticating the footage must have actually witnessed the events as they occurred, merely that he or she is able to verify that the material is what it purports to be: in this instance, the complete surveillance footage of the incident." *Id.*, quoting *Green*, 7th Dist. No. 12 MA 226 at ¶ 14. "Reliability can be proven by the video equipment installer, a user of the equipment, or by a law enforcement officer who investigated the matter." *Id.* "There is a very low bar for authenticating evidence, particularly video evidence under the 'silent witness' theory." *Id.* at ¶ 68.

**{¶35}** Both circumstantial and direct evidence may be used to show authenticity under Evid.R. 901, which has a low foundational threshold without requiring conclusive proof of authenticity. *State v. Inkton*, 2016-Ohio-693, 60 N.E.3d 616, ¶ 73 (8th Dist.). "Rulings regarding authentication, like evidentiary rulings more generally, are reviewed for an abuse of discretion." *State v. Gibson*, 7th Dist. Mahoning No. 15 MA 0074, 2016-Ohio-8552, ¶ 32. An abuse of discretion involves an unreasonable, arbitrary or unconscionable decision. *State v. Herring*, 94 Ohio St.3d 246, 255, 762 N.E.2d 940 (2002). We defer to the trial court's judgment without substituting our preference over that of the trial court. *Id.*

**{¶36}** Considering the totality of the testimony and the fact that the rule's list of authentication methods is not exhaustive, we do not find the trial court acted unreasonably, arbitrarily, or unconscionably in admitting the video of the child's CAC interview. In any event, there are bars to such review.

**{¶37}** Initially, we note the rule says authentication can also occur by "[a]ny method of authentication or identification provided by statute enacted by the General Assembly not in conflict with a rule of the Supreme Court of Ohio or by other rules prescribed by the Supreme Court." Evid.R. 901(B)(10). There is a statute which allows hospital records to be "qualified by certification" in lieu of in-court authentication testimony where the records "custodian, person who made them, or person under whose supervision they were made" endorses upon the records their "verified certification identifying such records, giving the mode and time of their preparation, and stating that they were prepared in the usual course of the business of the institution." R.C. 2317.422. The offering party must deliver a copy to the opposing attorney no less than five days before trial. *Id.*

**{¶38}** In October 2022, defense counsel filed a motion to continue the November 2022 trial date, stating he was recently retained as replacement counsel and received discovery in September. This motion sought additional time to review the discovery evidence, referring to the medical director's opinion letter and the "Child Forensic Interviews Protocol Documentation (notes, audio tapes, and/or video tapes) produced by [the CAC social worker]." (10/28/22 Mot.). The defense also disclosed it had consulted with and was submitting this evidence to an expert for medical analysis.

{¶39} Notably, the written motion in limine filed by the state relied on the hearsay exception for medical diagnosis or treatment hearsay and said the statements were non-testimonial for confrontation clause purposes, while pointing out the examining physician watched the interview through the one-way mirror in order to gain information for the subsequent medical examination. Just prior to jury selection, the state presented an argument on its motion in limine, stating case law supported the admission of the video under the hearsay exception applicable to medical diagnosis and treatment. *See* Evid.R. 803(B)(4) (regardless of whether the declarant is unavailable, a hearsay exception admits "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment").

{¶40} The defense generally objected to this medical diagnosis or treatment argument, while acknowledging the case law cited in the state's motion. (Tr. 8-9). When the state later offered the video at trial during the medical director's testimony, the defense "renew[ed]" the earlier objection. No further argument was set forth, and there was thus no reference to authentication flaws. (Tr. 378, 402-403).

{¶41} "Error may not be predicated upon a ruling which admits * * * evidence unless a substantial right of the party is affected; and * * * a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context * * *." Evid.R. 103(A)(1). Considering the defense objection was a renewal of a prior general objection to an in limine request based on whether the interview was for medical diagnosis or treatment, an argument on the sufficiency of the video's authentication as a hospital record was not apparent as a specific ground for the objection. Accordingly, there was no authentication objection as to the video interview.

{¶42} Had an objection been tendered on grounds of authentication, further inquiry of the medical director or a claim the evidence was already qualified by certification could have been made by the state. Therefore, the Evid.R. 901 authentication argument was waived, and our evaluation of the issue may proceed only under a plain error review. *State v. Allen*, 73 Ohio St.3d 626, 634, 653 N.E.2d 675 (1995) (where a capital murder

defendant complained blood samples and other pieces of evidence were not properly authenticated under Evid.R. 901, the Supreme Court ruled he "never made this objection at trial, and thus waived this issue absent plain error"); *Haywood*, 7th Dist. No. 21 CO 0035 at ¶ 58.

**{¶43}** Pursuant to Crim.R. 52(B), plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court. Plain error is a discretionary doctrine the appellate court may choose to use only with the utmost care in exceptional circumstances when required to avoid a manifest miscarriage of justice. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 62. To establish plain error, the defendant must demonstrate an obvious error that affected the outcome of trial. *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700 at ¶ 93, citing *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22.

**{¶44}** We point to our review of the case proceedings and testimony set forth above. We also note the child could be seen on the video speaking to a hospital social worker known to the medical director in a room he recognized. (The medical director mentioned the office set up while noting the screams in the background were likely made by children receiving vaccines.) The child's photograph had already been admitted into evidence after being identified by the chief of police, who watched the interview as it occurred. Considering the CAC medical director's testimony (including that the child-victim's video interview conducted by the hospital social worker was standard procedure prior to the medical examination and was part of the medical records maintained with other patient records in the hospital's computer server), there was no obvious error requiring the trial court to sua sponte find the video interview offered for admission was not sufficiently authenticated. Exceptional circumstances on the video's authenticity, resulting in a manifest miscarriage of justice, are not apparent. This assignment of error is overruled.

<u>SUBASSIGNMENT OF ERROR TWO</u>

**{¶45}** Appellant's second sub-assignment of error, together with his general assignment of error, contends:

"The Trial Court erred in admitting the video statement of the victim into evidence * * * B) The exhibit contained testimonial evidence violating Defendant's Right to Confrontation."

**{¶46}** The confrontation clause in the Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Ohio's constitution provides no greater confrontation rights than the Sixth Amendment. *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, 70 N.E.3d 508, fn. 8. Unlike our deference to the trial court's discretion in applying hearsay exceptions, "we review de novo evidentiary rulings that implicate the Confrontation Clause." *Id.* at ¶ 97.[1]

**{¶47}** The confrontation clause does not apply to non-testimonial statements. *Ohio v. Clark*, 576 U.S. 237, 245, 135 S.Ct. 2173, 192 L.Ed.2d 306 (2015); *Michigan v. Bryant*, 562 U.S. 344, 358-359, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011). Therefore, a statement will not be evaluated under the confrontation clause unless its primary purpose was testimonial. *Clark*, 576 U.S. at 246-247 (even then, "the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause"). In determining whether a statement was testimonial, the court considers whether the primary purpose of the conversation was to create an out-of-court substitute for trial testimony. *Id.* at 245 (extending the primary purpose test to statements made to individuals who are not law enforcement agents).

**{¶48}** Appellant argues a primary purpose of the CAC interview was to assist a law enforcement investigation, pointing to case law on the dual capacity of a CAC forensic interviewer. Appellant emphasizes testimony by the police chief that he did not conduct a full interview of the child on the day he received the sexual assault complaint because

---

[1] *Compare State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 48-49, 56 (in determining whether a child-victim's statements fall under the hearsay exception for statements "made for purposes of medical diagnosis or treatment," the trial court exercises discretion while considering the totality of the circumstances including the child's age, consistency, motive to lie, understanding of the need to tell the truth, and exposure to leading or suggestive questioning).

CAC would conduct a detailed interview. The state points out the police chief explained a child would not want him asking her sensitive questions when CAC employees are trained to conduct a "well-rounded" approach to help child-victims and their families. (Tr. 256-258).

**{¶49}** As discussed above, the medical director explained their trauma-informed, developmental-appropriate, and family-oriented approach was created in order to avoid further trauma to the child (such as that occurring when CAC staff interviews a child for medical reasons after the child has already been subjected to detailed interviews by law enforcement and children services). The CAC social worker conducts the hospital's intake interviews with medical personnel watching before the medical examination proceeds. Agents from law enforcement and children services may watch live through a one-way mirror or may view a video of the interview later. The approach also avoids suggestive or leading tactics as the hospital social worker is trained to use open-ended questions as opposed to vigorous investigative interviewing techniques. The medical director said the primary purpose of the interview was for medical diagnosis and management.

**{¶50}** Nevertheless, Appellant generally concludes the child's interview primarily served an investigative purpose and thus must be considered testimonial evidence. He quotes law stating where the primary purpose of particular statements by a child to interviewers at CAC were for medical diagnosis and treatment, those statements were nontestimonial and admissible without violating confrontation rights but other statements that served "primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial." *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, 933 N.E.2d 775, ¶ 44 (application of the hearsay exception was not raised).

**{¶51}** As Appellant points out, the *Arnold* case relied on the underlying premise that even when out-of-court statements are admissible under state hearsay rules of evidence, the statements violate a defendant's Sixth Amendment right to confront witnesses if the statements "are testimonial and the defendant has had no opportunity to cross-examine the declarant." *Id.* at ¶ 13, citing *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("the Sixth Amendment demands what the

common law required: unavailability and a prior opportunity for cross-examination"). Although the law cited by Appellant allows the admission of the non-testimonial portions of a CAC interview (even if other statements during the interview were generated for primarily forensic purposes), Appellant does not specify which statements he contests were primarily for investigative purposes or review any specific passages from the interview. Nor did he object to particular statements within the interview below when objecting to the video as a whole.

**{¶52}** In any event, the argument on appeal essentially ignores portions of the case law he quotes. Importantly, the rule Appellant cites on excluding testimonial evidence is qualified by the following phrases: "when the declarant is unavailable for cross-examination at trial" or "when the defendant has had no opportunity to cross-examine the declarant." *Arnold*, 126 Ohio St.3d 290 at ¶ 13, 44. As the state points out, *the child-victim testified at trial*.

**{¶53}** "[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 127, quoting *Crawford*, 541 U.S. 36 at fn. 9. The Ohio Supreme Court thus held the use of an out-of-court statement did not implicate the confrontation clause where the declarant was called to testify at trial. *Id.* (even if the statement was offered during the testimony of a different witness).

**{¶54}** Moreover, in a subsequent case, a defendant argued the trial court violated the confrontation clause by admitting a witness' statement to police because the defense did not have an earlier opportunity to cross-examine the witness about the statement. The Supreme Court rejected this argument because the witness testified at trial and was subject to cross-examination *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 113. *See also State v. Palmer*, 7th Dist. Mahoning No. 19 MA 108, 2022-Ohio-2643, ¶ 8-9 (the failure to raise a Sixth Amendment violation did not constitute ineffective assistance of counsel because the confrontation clause does not preclude the admission of a declarant's out-of-court statements when the declarant testifies as a witness subject to cross-examination).

{¶55} In accordance, Appellant's argument under the Sixth Amendment's confrontation clause is without merit because Appellant had the opportunity to confront the victim as she testified at trial.

{¶56} For the foregoing reasons, Appellant's assignment of error is overruled, and his convictions are affirmed.

Waite, J., concurs.

Klatt, J., concurs.

[Cite as *State v. Minor*, 2024-Ohio-1465.]

———————————

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Columbiana County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**