[Cite as *State v. Martin*, 2024-Ohio-5332.]

# IN THE COURT OF APPEALS OF OHIO

## SEVENTH APPELLATE DISTRICT
## JEFFERSON COUNTY

STATE OF OHIO,

Plaintiff-Appellee,

v.

JOHN EDWARD MARTIN,

Defendant-Appellant.

---

**OPINION AND JUDGMENT ENTRY**
**Case No. 24 JE 0001**

---

Criminal Appeal from the
Court of Common Pleas of Jefferson County, Ohio
Case No. 23 CR 10

**BEFORE:**
Carol Ann Robb, Cheryl L. Waite, Katelyn Dickey, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Jane M. Hanlin*, Prosecutor, and *Jeffrey J. Bruzzese*, Assistant Prosecuting Attorney, for Plaintiff-Appellee and

*Atty. Stephen E. Palmer*, for Defendant-Appellant.

Dated:  November 6, 2024

**Robb, P.J.**

{¶1}   Defendant-Appellant John Edward Martin appeals his convictions of raping a child, which were entered after a jury trial in the Jefferson County Common Pleas Court. He raises arguments on the following topics:  hearsay, confrontation clause, the scope of the testimony by the child advocacy center physician, allowing the jury to watch the victim's mother assert the privilege against self-incrimination, restriction on detailed questioning of a child witness on a romantic relationship with the victim, ineffective assistance of counsel, whether a witness opined on victim veracity, sufficiency of the evidence, and weight of the evidence.  For the following reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.

STATEMENT OF THE CASE

{¶2}   On March 1, 2023, Appellant was indicted on two counts of rape in violation of R.C. 2907.02(A)(1)(b) (sexual conduct with a child under the age of 13).  The offenses were alleged to have occurred between January 1, 2019 and September 12, 2022.  By the end of this date range, the victim was twelve years old, and Appellant was her stepfather.  The case was tried to a jury where testimony was presented by the victim, her middle school guidance counselor, friend 1, friend 2, a physician from the child advocacy center where the victim was examined, and the investigating detective.  Another friend (friend 3) did not testify but is discussed in the testimony.

{¶3}   At the time of the jury trial, the victim was fourteen years old.  In discussing the background of her initial disclosure, she testified she initially met with her middle school guidance counselor to discuss concerns about her eating habits.  Subsequently, she told friend 3 something happened with Appellant the prior week.  The victim testified this friend encouraged her to tell someone, and they went to the guidance counselor's office to do so.  (Tr. 276).  According to the victim's testimony, "I told him that he touched me where I shouldn't have been touched."  (Tr. 277).  She then met with a social worker, and the recorded interview was played at trial.  This interview contained a similar statement by the victim, who refrained from much speaking but made various gestures, while indicating the touching included penetration.  (St.Ex. 3).  On the stand, the victim attested she did not tell any lies in the video.  (Tr. 283).

{¶4} After this 2021 disclosure, Appellant moved out of their house; however, the victim testified her mother did not support her disclosure. (Tr. 293, 297). As explained by the victim, every time her mother asked if the allegations were true or if she were lying, it seemed as if her mother wanted her to say they were not true. The victim also spoke in person to Appellant's mother, who was upset and told her not to make up allegations if they were not true because they would put Appellant away for a long time. (Tr. 296-297). Not long after this, her mother drove her to the police station where she told a police officer the allegations were not true. According to the victim, she recanted because her allegations were negatively affecting everyone in her family. (Tr. 298).

{¶5} Appellant moved back into the victim's house. A few weeks later, the sexual abuse resumed. (Tr. 299, 301). The victim testified Appellant put his penis in her vagina. She also testified Appellant put his penis in her mouth. "Sometimes" this occurred when her mother was away from the house. "Sometimes" this occurred when her mother was in the shower. (Tr. 305). She testified Appellant forced her to have sex with him over a period of time and if she went along with his requests, he would sometimes agree to help her with certain things, such as claiming he would help her get her phone back from her mother. (Tr. 310-311). However, when he discovered a phone she was using to text and video call friend 2, he broke it. (Tr. 311-312). While she was on such a video call hiding under her bed, he came in her room and asked her to have sex with him. (Tr. 308-309).

{¶6} The victim identified screenshots of text messages she sent to friend 2. (Tr. 313); (St.Ex. 2). In one text, friend 2 asked, "Who did you lose your v card to?" The victim replied, "John I guess. But I don't really count that . . . Because it wasn't someone I wanted. And it just feels weird to say, 'oh heyyy my stepdad took my v card'." When friend 2 asked the age of this person who was having sex with a child, the victim said, "He's 30 something." When the friend asked, "How many times did you suck John's dick to get what you want," the victim replied, "Maybe like 6 or something. Maybe 7, idk." When the friend asked if Appellant "raped" her, the victim replied, "Pretty much." In another text, the victim mentioned an experience occurring minutes earlier by texting, "He just put it in me once and then quit cause I said no."

{¶7} The guidance counselor testified to his involvement in twice reporting his concern for the victim to children services. On October 14, 2021, when the victim was

eleven years old, he met with her after friend 1 wrote a note to a teacher expressing concern about the victim's sparse eating habits. (Tr. 208, 227); (St.Ex. 1). A month later, on November 12, 2021, the victim entered his office with friend 3 and made a sexual abuse disclosure that triggered his duty as a mandatory reporter. (Tr. 213-214, 228). On cross-examination, the guidance counselor said the victim indicated the last time she was abused was the prior week. (Tr. 228). He also said that not long after his report, the victim explained to him that she decided to tell the authorities "nothing happened" after conversations with her family made her feel anxious. (Tr. 230).

{¶8} On September 12, 2022, the guidance counselor learned information requiring him to make second report to children services. Friend 2 showed him the victim's text messages indicating she was being sexually abused by her stepfather. (Tr. 219-220). When the guidance counselor then met with the victim, she merely stated if she said something, "it would only complicate things at home." (Tr. 222).

{¶9} After the 2022 allegations, the victim was placed with the family of friend 1, who testified the victim slept with the bedroom light on and seemed scared around men and to be alone. (Tr. 251-252). Friend 1 also spoke about when she first started having concerns about the victim. She said the victim seem depressed and distant when school reopened in the fall of 2020 after the pandemic closure. (Tr. 241-242). The victim dressed more conservatively in clothes that seemed too hot for the temperature. The friend noticed the victim biting her knuckles, pulling her hair out, and even more concerning evidence of self-harm, including cuts on the victim's wrists, thighs, and ankles. (Tr. 242-243). During the next school year, friend 1 decided to write a note seeking help for the victim's eating habits. (Tr. 241, 245). She also testified that during the victim's twelfth birthday party, friend 3 spoke about being sexually abused. (Tr. 249-250).

{¶10} Friend 2, who reported the text messages to the guidance counselor, confirmed her receipt of the texts from the victim and was asked about the content of the texts. (Tr. 321-3335). She explained "V card" referred to virginity. (Tr. 334). She additionally discussed a video call during which the victim was hiding under her bed while grounded; the victim declared she heard someone coming in the room and immediately thereafter reported it was John asking for sex. (Tr. 336-338). On cross-examination,

Friend 2 testified she was in a relationship with the victim at the time the messages were sent. (Tr. 341).

**{¶11}** The victim's mother filed a motion to quash her subpoena on grounds of spousal privilege and self-incrimination. She had pending child endangering charges against her, which were filed as a result of the circumstances of this case. When called as a witness by the state, the victim's mother refused to testify and pled the Fifth Amendment right against self-incrimination from the stand.

**{¶12}** The police detective assigned to the case in 2022 upon the second report to children services testified to downloading the victim's text messages from friend 2's phone. He said the texts covered the time period from December 20, 2021 (after the first report and recantation) to July 15, 2022 (two months before the second report). (Tr. 378-381). The detective was also involved in scheduling the 2022 child advocacy center interview. He recapped the interview by testifying, "[The victim] didn't say it didn't happen, but she didn't say it did happen." (Tr. 402, 407-408).

**{¶13}** The detective testified the victim's mother indicated that she believed the victim was lying. (Tr. 375). After the victim was physically examined by a child advocacy center, the victim's mother called and told him a virginity test showed the victim was still a virgin; he noted he never heard of a virginity test in his training. (Tr. 381). The detective identified a recorded jail call between Appellant and the victim's mother, which was played at trial. (Tr. 391); (St.Ex. 5).

**{¶14}** The detective's interview of Appellant was also played. (Tr. 387-388); (St.Ex. 4, stopping at the 40-minute mark). During the interview, Appellant said he married the victim's mother in July 2022 (between the 2021 and the 2022 allegations). Appellant claimed the victim fabricated the 2021 allegations after her friends made up similar allegations at a birthday party. According to Appellant, one child said if you report you will get more gifts every year, and another child said that was how she got her stepfather out of the house. Appellant said everything was fine between himself and the victim after she recanted the 2021 allegations. He noted he did not permit the victim to have a phone or use the internet. He also did not want her speaking to her friends who were "gay or trans." When he found her with a phone in the summer of 2022, he said he disposed of it because he saw a message expressing love to her girlfriend. Appellant

attributed the 2022 allegations to the victim being exposed to her friends when the school year started.

{¶15} The supervising physician from a child advocacy center in Pittsburgh testified the child was interviewed by their social worker and physically examined by their physician assistant in November 2022. She explained the center's medical personnel relied on the interview, information learned during the exam, and the text messages to determine appropriate testing, which is dependent on the types of sexual acts and the length of time since the act. For instance, samples from the victim were taken by throat swab, urine collection, and blood draws for various types of sexually transmitted diseases, but a rape kit was not performed since the victim had been removed from Appellant's presence for a month by the time of the examination. (Tr. 452-454, 481-482).

{¶16} The physician relied on these items for her medical review and viewed the images of the victim's body as if conducting the examination "virtually" before signing the medical report; she pointed out the physician assistant practiced under the physician's medical license. (Tr. 446-458, 483-485, 494, 502-503). The physician testified to her observation that the victim's hymen was intact, with a slight bump at the 6 o'clock position, which could be a normal variant. (Tr. 458). She emphasized a normal examination of the vaginal area does not indicate the lack of sexual assault. She explained there is no virginity test, pointing out the hymen is a ring or "doughnut" of tissue and not a sheet. (Tr. 458-484). She also discussed the team's concerns about the victim's safety because she was not believed by her mother who was claiming the medical tests showed the victim was still a virgin. (Tr. 490). A phone call was played at trial, wherein the physician and the victim's mother discussed the results of the child's medical examination and the concerns for the child. (St. Ex. 6).

{¶17} The defense successfully requested lesser included offense instructions on gross sexual imposition. However, the jury found Appellant guilty of both counts of rape. The court imposed a sentence of 25 years to life on each count, ran the sentences consecutively, and designated Appellant a Tier III sex offender. Appellant filed a timely appeal from the January 9, 2024 sentencing entry.

ASSIGNMENT OF ERROR ONE

{¶18} Appellant sets forth nine assignments of error, some containing multiple arguments. The first assignment of error provides:

"The Trial Court committed reversible error by admitting improper hearsay in violation of the Rules of Evidence thereby depriving Appellant of Due Process of Law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶19} Appellant raises various inadmissibility claims based on the rule against hearsay, Evid.R. 802. We begin by pointing out that some of the alleged instances of error were not preserved for appeal. Error may not be predicated upon a ruling which admits evidence unless a substantial right of the party is affected and a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context. Evid.R. 103(A)(1).

{¶20} Appellant therefore reasserts several allegations of hearsay under assignment of error six, where he claims the failure to object constituted ineffective assistance of counsel. We relocate those arguments here, incorporating by reference the ineffective assistance test requiring deficiency and prejudice as set forth under the sixth assignment of error.

{¶21} Appellant also cites the plain error doctrine. Pursuant to Crim.R. 52(B), plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court. However, the Supreme Court emphasizes that plain error is a discretionary doctrine the appellate court may choose to employ only with the utmost care in exceptional circumstances when required to avoid a manifest miscarriage of justice. *State v. Noling*, 2002-Ohio-7044, ¶ 62. To establish plain error, the defendant must demonstrate the court's obvious error and must show the error affected the outcome of trial. *State v. Graham*, 2020-Ohio-6700, ¶ 93, citing *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "The accused is therefore required to demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims." *State v. Rogers*, 2015-Ohio-2459, ¶ 22.

**{¶22}** Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Evid.R. 801(C). As emphasized by the state, a statement is not hearsay if: "The declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is . . . consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive . . ." Evid.R. 801(D)(1)(b). A prior statement of a testifying witness is also not hearsay if it was "one of identification of a person soon after perceiving the person . . ." Evid.R. 801(D)(1)(c) (if the circumstances demonstrate the reliability of the prior identification). Prior identification may be established by the person who made the identification or by a third person in whose presence the identification was made. *State v. Boston*, 46 Ohio St.3d 108, 124 (1989).

**{¶23}** During Appellant's police interview, he made claims of recent fabrication, improper influence, and motive to lie by the victim and her friends (in addition to his claim of prior fabrication). Contrary to a contention in Appellant's reply brief, the fact that the state was the party introducing his interview did not bar the state from rebutting his declarations. In fact, only the state could introduce these statements by Appellant, the party opponent. Evid.R. 801(D)(2). The declarations Appellant made to defend himself at the interview were part of his defense or at least were part of "an express or implied charge against the declarant" victim under Evid.R. 801(D)(1)(b), whether or not he *later* wanted them to be considered when ruling on the admissibility of the victim's prior consistent statements.

**{¶24}** In any event, defense counsel asserted to the jury in opening statements that the victim's latest allegations of oral and vaginal intercourse were recent fabrications going beyond her original allegations, which she had previously recanted to children services. The defense also actively claimed (or at least insinuated) the victim's girlfriend or friends influenced her to make up the allegations and the victim was motivated to do so as a form of "currency" (to receive attention, gifts, and a new place to live).

**{¶25}** "Courts have repeatedly held that attacking a victim's credibility during opening statements is grounds for permitting a prior consistent statement into evidence under Evid.R. 801(D)(1)(b*)." State v. Wright*, 2022-Ohio-1786, ¶ 100 (2d Dist.), quoting

*State v. Black*, 2019-Ohio-4977, ¶ 26 (8th Dist.), citing *State v. Abdussatar*, 2006-Ohio-803, ¶ 15 (8th Dist.) (because defense counsel's opening statement said the victim fabricated the rape and because the victim testified at trial, the trial court did not err by admitting a prior consistent statement in a letter); *State v. Hunt*, 2013-Ohio-5326, ¶ 39 (10th Dist.) (opening statement by the defense implied the victim lied to police, and this allegation of recent fabrication or improper influence permitted the state to introduce the victim's prior consistent statements). Likewise, this district concluded that impliedly or expressly attacking the credibility of a victim or other witness during opening statements is grounds for permitting a prior consistent statement into evidence pursuant to Evid.R. 801(D)(1)(b). *State v. Hayes*, 2019-Ohio-2696, ¶ 25-28 (7th Dist.).

**{¶26}** In addressing the specific items contested by Appellant as hearsay, we begin with the state's inquiry as to what the guidance counselor learned from friend 2 on September 12, 2022 that resulted in his meeting with the victim the same day and triggered his professional obligation to take action as a mandatory reporter. When defense counsel objected, the state said the purpose was to show the basis for his reporting and pointed out friend 2 and the victim would both be testifying at trial. The guidance counselor then testified friend 2 showed him text messages she received wherein the victim indicated she was being molested by her stepfather. (Tr. 219-220). The guidance counselor's general statement as to why he reported in 2022 after friend 2 showed him texts did not recite the specifics of the texts. He merely mentioned reading a statement of identification proven to be sent by the testifying declarant, one who thereafter confirmed her identity as the sender and confirmed the identification of her abuser. Regardless, this disclosure by the guidance counselor did not prejudice the defense considering the circumstances surrounding the texts discussed below.

**{¶27}** Appellant argues it was erroneous to admit the texts as an exhibit or mention them in testimony. The victim informed the child advocacy center's social worker during the 2022 interview that she sent the texts. As the victim would not say more during that interview, the texts were used for medical diagnosis and treatment in the subsequent physical examination. At trial, the texts were identified by the testifying victim, who was available for cross-examination had the defense opted to do so. The texts were also

identified by friend 2, who received them on her phone and provided them to the detective. This detective testified to retrieving the texts from the friend's phone.

**{¶28}** The defense specifically voiced there was "No objection" to the admission of the texts as State's Exhibit 2 and their publication to the jury during the testimony of friend 2. (Tr. 324). Notably, the victim specifically testified Appellant put his penis in her mouth and in her vagina. Again, the defense claimed this was a fabrication that went beyond her prior allegations; he also argued the victim's claims were improperly induced by the influence of friends and by the motive to receive attention and other benefits. *See* Evid.R. 801(D)(1)(b).

**{¶29}** In opening statements, defense counsel said the texts were "evidence of a child that has a problem, that has a need to fit in with her peers, has a need to maybe play the victim with her girlfriend, and make allegations she never thought would end up in a court of law." (Tr. 199). In October 2022, Appellant told the police the victim recently fabricated the allegations after being exposed to her friends at school upon the start of the 2022 school year, and he indicated he prohibited the victim from seeing her friends over the summer or using communication devices. Yet, the texts showed she had been disclosing Appellant's sexual abuse in the first half of 2022 (until he confiscated her phone).

**{¶30}** As fully discussed in assignment of error six, effort must be made to avoid the distorting effects of hindsight as there is a wide range of effective assistance by trial counsel, who is strongly presumed to be competent. *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Counsel's defense tactic was to discredit the victim and to show her friends had influenced her to make up allegations. The genesis of this strategy was Appellant's assertion that the victim was instructed by her friends on the various reasons to lie. Appellant made this assertion in his interview with the detective (although his date of the birthday party varied from the date provided by a witness at trial). As explained above, the recording of this interview was properly played for the jury as an admission by a party opponent.

**{¶31}** Ineffective assistance of counsel has not been demonstrated in the lack of objection to the texts. *See, e.g., State v. Black*, 2019-Ohio-4977, ¶ 33-36 (8th Dist.) (defense counsel was not deficient for failing to object to alleged hearsay statements,

such as the victim's prior statements to a friend or texts to her stepmother, as these were prior consistent statements that could be seen as admissible nonhearsay). Moreover, plain error by the trial court (in failing to sua sponte question the propriety of allowing the texts into evidence) was not apparent. *See, e.g., State v. Bouyer*, 2023-Ohio-4793, ¶ 76 (8th Dist.) (no plain error where text messages from the victim to her mother about feelings toward her mother's husband was admissible to rebut claim that victim made accusations based on improper motive).

**{¶32}** Returning to the guidance counselor, Appellant takes issue with his testimony that at the 2022 meeting, the victim told him "if she talked it would only complicate things between the family." (Tr. 220). There was no objection to this testimony. It benefited the defense to allow the jury to hear that the victim made no sexual assault disclosure to the guidance counselor in 2022. Neither plain error nor ineffective assistance of counsel is apparent.

**{¶33}** Appellant also says the guidance counselor presented inadmissible hearsay by testifying that sometime after the victim's 2021 disclosure, she told him she was anxious, her family was disbelieving, and she recanted to please them by telling children services "nothing happened." (Tr. 230). This was not plain error. The information *was elicited by defense counsel on cross-examination*. A defense strategy was to emphasize the victim's 2021 recantation and to argue the victim returned to fabricating allegations to receive attention, including from friend 2 (who was emphasized by the defense as encouraging the victim to make allegations). The tactic did not evince ineffective assistance of counsel.

**{¶34}** Appellant then points to items from the guidance counselor's file admitted into evidence over his objection, including: the November 12, 2021 note from friend 1 expressing concern about the victim's eating habits; the counselor's brief office note from November 12, 2021; the counselor's brief office note from September 12, 2022; and a September 20, 2022 non-detailed letter he received from children services acknowledging receipt of his report and the opening of a case regarding this child. (St.Ex.1); (Tr. 221). The information in these items *was presented in the testimony*, which in turn is discussed elsewhere herein if raised. For instance, we discussed the admissibility of prior consistent statements and statements of identification above.

Case No. 24 JE 0001

{¶35} Likewise, Appellant presents a hearsay argument as to friend 1 testifying over objection that the victim told her she "had some sort of sex with an older guy, and it wasn't willing." (Tr. 247). This 2021 disclosure also constituted a rebuttal to the defense accusations of the victim fabricating new allegations in texts to friend 2 in 2022. We additionally note friend 1 then said she believed the victim was talking about a teenager when she mentioned an "older guy" which could be viewed as lessening any prejudice from hearing this disclosure. (Tr. 248). Furthermore, the victim's *more specific* 2021 disclosure made to authorities when she was eleven years old was in evidence through other means, including through her own testimony. She initially testified he touched her where she should not have been touched by using the body part that only men have below the waist to touch the body part that only women have below the waist. (Tr. 277, 284). Although Appellant complains this was vague, the victim's testimony subsequently confirmed these parts were his penis and her vagina (when discussing how the abuse "started up again" after her initial recantation). (Tr. 301-304).

{¶36} Then, Appellant argues friend 2 should not have been permitted to testify over objection to the following items: she spoke to the guidance counselor in 2022 in order to show him the victim's texts (from months earlier) indicating Appellant was sexually abusing her; Appellant would do favors for the victim when she complied with requests for sex; and the victim hid the phone under the bed while they were on a video call and soon returned to report Appellant asked her to have sex with him. (Tr. 322, 336-337). As the state urges, the testimony contained prior consistent statements to rebut the accusations of both past and recent fabrication, improper influence, or motive to lie and/or contained statements identifying the testifying victim's abuser, concepts addressed in our general analysis of this assignment of error above. Additionally, the victim had already testified to the underlying facts, and the texts were in evidence after it was specifically stated the defense had "No objection" to the admission of the exhibit containing the texts. (Tr. 324).

{¶37} Next, Appellant argues the trial court erred in admitting the recorded interview of the victim by a child advocacy center social worker after the victim's 2021 disclosure of Appellant's sexual abuse. (St.Ex. 3). Because the victim testified, no confrontation clause issue is raised here. *State v. Minor*, 2024-Ohio-1465, ¶ 52 (7th Dist.)

(even testimonial portions of the interview serving primarily an investigative purpose are not violative of the Sixth Amendment when the declarant is available for cross-examination at trial). Rather, Appellant argues the recorded November 12, 2021 interview was inadmissible hearsay.

**{¶38}** "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4) (the declarant need not be unavailable). The dual capacity of the social worker at the child advocacy center interviews does not transform the nature of a child's entire interview from being for the purpose of medical diagnosis and treatment to being merely investigatory. *State v. Arnold*, 2010-Ohio-2742, ¶ 44 (applying primary purpose test for confrontation clause test). Different statements in the interview can have different natures under the law. *Id.* Even so, when the entire recording is played, any statements it may contain with a non-medical purpose can be considered harmless. *Id.*

**{¶39}** During the victim's testimony, defense counsel objected to playing the November 12, 2021 video. (Tr. 278, 287-292). In specifying a portion that seemed purely investigatory rather than for medical purposes, defense counsel pointed to the end of the interview when the social worker returned to the interview room to ask the victim who was with her when she first disclosed the abuse and the child answered by saying friend 3 went with her to the guidance counselor's office. Defense counsel also argued the medical diagnosis or treatment exception to the hearsay rule was not satisfied because the social worker coordinated the interview with a police officer who possibly proposed the last question. Additionally, after acknowledging a child's discussion during a child advocacy center interview of what body parts were touched could be for medical treatment, the defense proclaimed an interview should lose its ability to qualify under the medical diagnosis or treatment exception if a medical examination does not end up occurring after the interview.

**{¶40}** First, as to the statement at the end of the video where the victim named the friend who went with her when she first disclosed the abuse to her guidance counselor, the victim had testified to this before the recording was played. (Tr. 276). In

any event, *defense counsel* had already asked the guidance counselor on cross-examination for the name of the friend who was with the victim during the first disclosure. (Tr. 229). Moreover, this information did not bolster the state's case but seemed favorable to the defense theory that this particular friend encouraged the victim to make up sexual abuse allegations in order to get what she wanted (as first proposed during Appellant's police interview).

**{¶41}** Regarding defense counsel's general argument about police coordination with medical personnel, the trial court agreed with the state's argument that a child advocacy center's interview of a child does not transform into a purely investigatory one if the police schedule it, consult with the social worker, and watch it from behind a mirror. This is standard procedure in such cases at such places. (Tr. 393-394). The procedure was developed in order to avoid subjecting a child-victim to multiple stressful interviews by multiple agencies. *Arnold* at ¶ 29-30, 33. The investigating officer's involvement behind the scenes in these types of interviews is not a transformative feature of an interview by a trained social worker conducting the dual-purpose interview (which will also be used by the medical professionals who listen live or later to prepare for a pending or a later-scheduled examination).

**{¶42}** On this point, the physical examination is a stage in the child's medical diagnosis and treatment plan occurring after the interview. However, there is no legal support for defense counsel's suggestion that it must occur immediately after or the same day as the interview conducted with a purpose to gather information for the medical team. Child advocacy center interviews are often scheduled by police officers several days or weeks after a report due to the unavailability of immediate personnel (especially medical professionals). However, this victim's diagnostic interview by the social worker took place *on the same day the report was made.* That is, the guidance counselor's testimony indicated the first disclosure by the victim to him occurred on November 12, 2021, the victim testified she was driven to the interview on the same day as her disclosure to the guidance counselor, and the video showed the date of November 12, 2021 on the corner of the screen. (Tr. 228, 277).

**{¶43}** In any event, it is not improper to schedule the physical examination for a different day (before which the recorded interview would be viewed by the attending

medical personnel). And an interview does not retroactively become purely investigatory with no medical purpose if the anticipated physical examination never takes place, such as occurred here after the November 12, 2021 interview. Notably, four days after this interview, the mother gave a written statement to police saying the child had recanted. (Tr. 376-377). A month later, the mother transported the child to the police station to formally recant to the investigating officer.

**{¶44}** Before the 2021 video was played, the victim identified herself as the person in the recording (and testified she was interviewed on the same day as her disclosure to the guidance counselor). (Tr. 277-278). After viewing the interview, it is clear the contents would be relevant to medical diagnosis (with the exception of the name of friend 3, which was already in evidence). This is especially true after considering the physician's later testimony about a 2022 interview and examination on the importance of certain information in order to determine testing and treatment protocol.

**{¶45}** In any case, in making the various objections to the video disposed of above, defense counsel *did not specify the current argument on a lacking foundation* to show the purpose of the interview was for medical diagnosis. In other words, there was no argument that the coordinating detective or interviewing social worker should have been called before playing the video in order to lay a foundation, rather than assuming the victim could lay the foundation for the video.

**{¶46}** We note the victim's disclosure in the 2021 interview could be viewed as rebutting the claim of recent fabrication, the claim about the motive to lie to gain attention and other benefits, and the claim of the improper influence of the friends who allegedly encouraged her to make up the allegations. Again, the defense theory was that the victim fabricated the allegations in the text messages as a form of "currency" to receive attention, gifts, and a new place to live. (Tr. 195); (St.Ex. 4). The evidence showed the text messages did not start until after the victim's recantation. (Tr. 378-381); (St.Ex. 2). In opening statements, the defense described the victim's verbal statements as being limited to being "touched" (sexual contact) in order to support the theory that text messages about sexual conduct were fabrications made after the 2021 disclosure (which was first made to a guidance counselor while with a friend who had also disclosed sexual abuse to the friend group). (Tr. 195-196).

**{¶47}** However, the 2021 interview contained an indication by the victim that the touching by Appellant included penetration. As explained above, a statement is not hearsay if: "The declarant testifies at trial or hearing and is subject to examination concerning the statement, and the statement is . . . (b) consistent with declarant's testimony and is offered to rebut an express or implied charge against declarant of recent fabrication or improper influence or motive, or (c) one of identification of a person soon after perceiving the person, if the circumstances demonstrate the reliability of the prior identification." Evid.R. 801(D)(1).

**{¶48}** Under all of these circumstances, an obvious error on the specific foundation argument presented on appeal does not exist, deficient performance by counsel is not indicated, and prejudice is not apparent. It would be a reasonable tactic for defense counsel to seek to exclude the video of the first interview *on certain limited grounds* while also seeking *to avoid instigating the prosecution to call additional state witnesses*, such as the prior detective and social worker, who may have possessed further negative information to relay to the jury.

**{¶49}** Finally, in the last sentence of the first assignment of error, Appellant's brief says "each instance" of alleged hearsay was sufficiently damaging to warrant reversal "separately and combined." The doctrine of cumulative error is not specifically mentioned, and the relevant law is not cited. Under the cumulative error doctrine, a conviction may be reversible when a reviewing court is convinced the cumulative effect of errors in a trial deprived the defendant of a fair trial, even though each instance of error was individually found harmless. *State v. McKelton*, 2016-Ohio-5735, ¶ 321-322. A cumulative error analysis cannot even be commenced if there were not multiple instances of error that were individually found to be harmless. *State v. Hunter*, 2011-Ohio-6524, ¶ 132. Even when a court finds multiple instances of harmless error, such harmless errors do not become prejudicial by sheer weight of numbers. *McKelton* at ¶ 322. To the extent a cumulative error argument is suggested, multiple errors have not been established, and even if certain arguments could be considered harmless error, it has not been convincingly established such instances combined to cause reversible prejudice.

{¶50} We overrule Appellant's first assignment of error. In doing so, we also overrule the portion of his sixth assignment of error where he reiterated the arguments from the first assignment of error under an ineffective assistance of counsel framework.

ASSIGNMENT OF ERROR TWO

{¶51} Appellant's second assignment of error alleges:

"The Trial Court committed reversible error by admitting improper hearsay evidence in violation of Appellant's rights of confrontation and to due process of law guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶52} The federal confrontation clause provides, "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. Amend. VI. Ohio's Constitution provides no greater confrontation rights than the Sixth Amendment. *McKelton* at fn. 8. Unlike the deference we give to the trial court's hearsay decisions, "we review de novo evidentiary rulings that implicate the Confrontation Clause." *Id.* at ¶ 97. Even when out-of-court statements are admissible under state hearsay rules of evidence, the statements may nevertheless violate a defendant's Sixth Amendment right to confront witnesses if the statements "are testimonial and the defendant has had no opportunity to cross-examine the declarant." *State v. Arnold*, 2010-Ohio-2742, ¶ 13, citing *Crawford v. Washington*, 541 U.S. 36, 68 (2004).

{¶53} Because the confrontation clause does not apply to non-testimonial statements, a statement will not be evaluated under the confrontation clause unless its primary purpose was testimonial. *Ohio v. Clark*, 576 U.S. 237, 245-247 (2015). In determining whether a statement was testimonial, the court considers whether the primary purpose of the conversation was to create an out-of-court substitute for trial testimony. *Id.* at 245 (extending the primary purpose test to statements made to individuals who are not law enforcement agents). Where a non-testimonial statement is admitted, the confrontation clause does not apply, and the matter is left to the application of state rules of evidence such as those on hearsay. *Michigan v. Bryant*, 562 U.S. 344, 358-359 (2011).

{¶54} A trial court does not violate the confrontation clause by admitting a prior testimonial statement, including one made to police, where the witness testified subject

to cross-examination at trial, even if the statement was offered during the testimony of a different witness. *State v. Lang*, 2011-Ohio-4215, ¶ 113; *State v. Perez*, 2009-Ohio-6179, ¶ 127, quoting *Crawford*, 541 U.S. at fn. 9. Likewise, the failure to raise a Sixth Amendment violation in such a situation does not constitute ineffective assistance of counsel. *State v. Jones*, 2024-Ohio-2562, ¶ 33 (7th Dist.) (where defense claimed some portions of the child advocacy center's interview video were primarily investigative rather than for medical diagnosis, there was no confrontation clause issue because the child-victim testified at trial), citing *State v. Palmer*, 2022-Ohio-2643, ¶ 8-9 (7th Dist.).

**{¶55}** In accordance with this law, Appellant only raises confrontation clause arguments as to statements by declarants who did not testify at trial. Appellant's prior assignment of error initially challenged these items as hearsay, and this assignment adds a confrontation clause argument. Regarding the items that Appellant contests under both principles, we have moved the hearsay arguments to this section in order to avoid having to repeat the content of each declaration and the procedure surrounding its admission. Appellant acknowledges a lack of objections on these items but asserts plain error and/or ineffective assistance of counsel.

**{¶56}** Appellant challenges the admissibility of two phone calls involving the victim's mother, who did not testify after pleading the Fifth Amendment. First, a recorded jail call between Appellant and the victim's mother was played during the detective's testimony. (St.Ex. 5). The defense had no objection to the playing of the jail call. (Tr. 391, 553).

**{¶57}** On appeal, Appellant makes conclusory hearsay and confrontation clause arguments as to this call. On the jail call, Appellant listened and responded to statements the victim's mother made. She discussed dealing with children services on the victim's current and future custody arrangements. She reported to Appellant on her plan to get the child removed from friend 1's house and to get Appellant released. Appellant asked if she found out what changed between the closing of the prior investigation and the filing of the complaint against him in the case at bar. Appellant criticized the agency for not revealing every fact they were relying upon. There was mention of the need to discover more information about what prompted this new investigation of Appellant. This

suggested an inquiry with the agency or even questioning the child, depending on who obtained custody.

**{¶58}** As discussed above (regarding Appellant's police interview), a defendant's own statement can be introduced by the state as non-hearsay. Evid.R. 801(D)(2)(a) (admission by a party-opponent). The state can also introduce as non-hearsay "a statement of which the [defendant] has manifested an adoption or belief in its truth . . ." Evid.R. 801(D)(2)(b).

**{¶59}** As the state points out, statements of a person on a call with a defendant can be presented in order to place the defendant's responses in context and give his statements meaning. *State v. Spires*, 2005-Ohio-4471, ¶ 39 (7th Dist.). Most of the mother's statements gave context to Appellant's own answers and declarations on the day the complaint was filed against him, especially those near the end of the call when he lamented the lack of information on the accusations against him and presumed he would not be able to make bail because it would be high. Additionally, some statements on the jail call tended to show the declarant's plan involving custody of the child-victim and contained statements of intent (to get off the phone to arrive in time for the imminent meeting with children services at friend 1's house where the child was staying). *See* Evid.R. 803(B)(3). The trial court did not commit an obvious error by failing to sua sponte preclude the playing of the jail call, and counsel did not commit a serious error in allowing it to be played without objecting.

**{¶60}** Likewise, the statements of the victim's mother on the jail call did not violate the confrontation clause merely because she was not available to be cross-examined at trial due to her pleading the Fifth Amendment. To be labeled as testimonial, the primary purpose of her statements must have been to provide an out-of-court substitute for testimony. *Clark*, 576 U.S. at 245-247 (also noting "the primary purpose test is a necessary, but not always sufficient, condition for the exclusion of out-of-court statements under the Confrontation Clause"). However, there was no indication this was the declarant's primary purpose when speaking to her husband, whom she supported and believed, on the day of his arrest. *See State v. Stewart*, 2009-Ohio-3411, ¶ 90, 96 (3d Dist.) (pointing out the comments of others to the defendant on a transactional recording provided context for his own statements and concluding there was no indication the

Case No. 24 JE 0001

primary purpose of those speaking in a recorded jail call was to prove past events potentially relevant to later criminal prosecution); *State v. Hampton*, 2019-Ohio-2555, ¶ 35 (5th Dist.) (in addressing jail calls, the court observed, "When statements are made for the primary purpose of communicating with friends or family, they are not made to aid in the prosecution or as the result of an interrogation").

**{¶61}** In sum, a non-testifying witness's statements to his friends or relatives are non-testimonial where the primary purpose of the statements was not to create an out-of-court substitute for trial testimony. *State v. Malvasi*, 2022-Ohio-4556, ¶ 57 (7th Dist.), citing *State v. Ash*, 2018-Ohio-1139, ¶ 72-75 (7th Dist.), citing *Giles v. California*, 554 U.S. 353, 376 (2008) (statements to friends are not subject to the confrontation clause); *McKelton*, 2016-Ohio-5735, at ¶ 185 (where the Ohio Supreme Court held the statement of defendant's daughter to the victim's niece was non-testimonial). In the absence of a testimonial statement, there was no confrontation violation.

**{¶62}** We also point out the lack of prejudice, which is required for plain error and ineffective assistance of counsel. Appellant argues the statements by the victim's mother in the jail call prejudiced his case because of a statement by the prosecutor in closing arguments. In countering the suggestion by the defense that the victim made up the allegation so she could go live with friend 1, the prosecutor suggested the jail call indicated the mother still could have recommended where the child would live (if she could find a willing relative). (Tr. 590). However, this does not support a claim of prejudice.

**{¶63}** The recording indicated the child was living at friend 1's house prior to the day Appellant was arrested, and the testimony showed she remained at that home through the time of trial. This actually supported the defense's theory that the victim fabricated the allegations in order to escape from her home and/or to live with her friend (as well as to get attention or gifts). (Tr. 195-199, 268-270); (St.Ex. 4). Additional statements during the call indicated the victim's mother and Appellant's parents supported and believed him over the child. Defense counsel's lack of objection to the jail call was not deficient or prejudicial. Likewise, there was no obvious and prejudicial error committed by the trial court in failing to sua sponte preclude the jail call to be played in its entirety.

**{¶64}** Next, Appellant challenges the admissibility of the recorded phone call during which the victim's mother spoke to the testifying physician in a conference call (while the detective was on the line). (St.Ex.6). In the call, the mother claimed the child advocacy center informed her the child was still a virgin because her hymen was intact. She also claimed a gynecologist at a different well-known clinic told her a virginity test was available. In response and due to concern for a child's safety where a mother expresses such beliefs, the physician made some of the *same explanations that she presented in her trial testimony* about the ability of the vagina to stretch and heal, the non-existence of a virginity test, and the concept that it is normal to see normal test results for sexual assault victims.

**{¶65}** The state's brief argues the mother's declarations were admissible under the statement against interest hearsay exception as she was unavailable as a witness, citing *State v. Baker*, 137 Ohio App.3d 628, 654 (12th Dist. 2000) (holding the statement of the defendant's girlfriend was admissible after she pled the Fifth Amendment because it showed she was helping appellant avoid detection for a crime). The victim's mother was viewed as having pressured the victim's recantation after the first round of disclosures and was accused of child endangering due to the second round of disclosures during which she insisted her child's examination showed she was a virgin and accused her child of fabricating claims of sexual assault.

**{¶66}** Under the statement against interest exception, where the declarant is unavailable as a witness, the court may admit a "statement that was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true." Evid.R. 804(B)(3) (if "corroborating circumstances clearly indicate the truth worthiness of the statement").

**{¶67}** The trial court noted the victim's mother raised spousal privilege and the right against self-incrimination, and the court relieved her from testifying when she took the stand and pled the Fifth Amendment. A declarant is unavailable if the court exempts her on the ground of privilege from testifying on the subject matter of her statement. Evid.R. 804(A)(1).

**{¶68}** No objection was made to the physician's introductory discussion and identification of the recording during her trial testimony. (Tr. 473-474,489-491). There was then a break for the state to arrange the playing of the recording at the proper place. After the break, the physician explained the reason for the phone call, and the prosecution asked to admit the phone call and publish it to the jury. The defense specifically conceded, "No objection as to the relevant portions of this phone call." (Tr. 491-492).

**{¶69}** Regarding the aforementioned relevant portions, the record shows they began playing the recording at the point where the victim's mother got on the conference call and stopped it before the detective started speaking about a future meeting. (Tr. 490-493). During the subsequent admission of exhibits, defense counsel again voiced the defense had no objection to this exhibit. (Tr. 553-554).

**{¶70}** This was a strategic decision, as the defense needed to demonstrate the victim was not credible, and allowing the jury to hear the victim's mother disparage her credibility bolstered the defense. The court's failure to sua sponte raise a hearsay or confrontation clause argument as to the recorded phone call was not an obvious error. The physician testified to the items she discussed in the call in any event, and the mother's statements were not offered for the truth of the matter asserted. *See* Evid.R. 801(C). In addition, outcome determinative prejudice is not evident, even assuming the call was objectionable. In addition to the fact that the physician testified to the information she relayed in the call, the mother's statements did not incriminate *Appellant* and were reasonably utilized as part of his defense.

**{¶71}** Lastly, Appellant takes issue with the testifying physician referring to information she learned from other child advocacy center employees at the time of the victim's 2022 visit to the center. The physician testified about how the child was interviewed by a social worker and examined by the physician assistant without a parent's presence and then the parent was provided with information. When the physician noted her physician assistant "was very concerned about the mother's interaction," defense counsel objected on hearsay grounds. (Tr. 448). After the state established a foundation through testimony that the physician assistant practices on the physician's license and the supervising physician relies on her physician assistant's observations, *defense counsel withdrew his objection.* (Tr. 451).

Case No. 24 JE 0001

{¶72} The physician then testified the victim had a hard time in the interview and the only sexual history the social worker could elicit from the victim was that the cited text messages were sent by the victim, and they were true. (Tr. 454, 456). *There was no objection by defense counsel.* Appellant says this lack of objection and the earlier withdrawal of an objection constituted ineffective assistance of counsel and plain error, as there was a violation of the hearsay rules and the confrontation clause because the physician assistant and social worker did not testify.

{¶73} As to the victim's statement about her texts, a hearsay exception allows "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Evid.R. 803(4). As we recited earlier, the physician explained why the victim's sexual history was relevant to the examination, testing, and treatment. The physician relied on the information learned during the interview and examination to fulfill her role as the supervising physician conducting a post-visit virtual examination and making her report. The trial court could reasonably assume counsel refrained from objecting because the statement attributed to the victim (regarding her text messages on sexual acts she experienced) satisfied the exception in Evid.R. 803(4). *See State v. Runnion*, 2022-Ohio-3785, ¶ 21 (7th Dist.).

{¶74} Likewise, the portions of a child advocacy center interview containing a child's statements relevant to medical diagnosis and treatment are nontestimonial and thus admissible without violating confrontation rights. *State v. Arnold*, 2010-Ohio-2742, ¶ 44 (but portions of the interview containing statements serving "primarily a forensic or investigative purpose are testimonial and are inadmissible pursuant to the Confrontation Clause when the declarant is unavailable for cross-examination at trial").

{¶75} In any event, the child, as the ultimate declarant, testified at trial and was available for cross-examination by the defense. Accordingly, even testimonial portions would not violate the confrontation clause. *See id.; State v. Minor*, 2024-Ohio-1465, ¶ 52 (7th Dist.) (where the child testified at trial, the defendant could not make a confrontation clause argument about non-medical portions of the child advocacy center video of the interview played during the medical director's testimony).

{¶76} Regardless, as to both issues, the defense wished to *highlight*, not hide, the fact that the victim's mother believed Appellant rather than her daughter. Defense counsel tactically decided to cross-examine the physician on her understanding of the victim's claim rather than object on hearsay or confrontation grounds. That is, his cross-examination of the physician pointed out the original notes did not say the victim said her texts were true, only that the victim said she wrote the texts. This was an important distinction that counsel was tactically permitted to emphasize. He wished to cast doubt on the victim's disclosures and on the rationality of the center's concern about the mother's disbelief of the child's texted claims. Counsel's performance was not deficient, and the trial court did not commit an obvious error or an error causing outcome determinative prejudice. This assignment of error is overruled.

ASSIGNMENT OF ERROR THREE

{¶77} Appellant's third assignment of error argues:

"The Trial Court committed error by permitting testimony from a state expert in violation of Ohio Criminal Rule 16(K), thereby depriving Appellant of due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 1, section 10 of the Ohio Constitution."

{¶78} "An expert witness for either side shall prepare a written report summarizing the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." Crim.R. 16(K). The purpose of this rule is to strengthen the due process right to a fair trial and to prevent unfair surprise by giving notice to the defendant, so he has an opportunity to challenge the expert's findings or qualifications. *State v. Boaston*, 2020-Ohio-1061, ¶ 44, 48 (coroner's report should have additionally disclosed that he would testify on time of death and on his comparison of a wound to an item collected as evidence by police). "Failure to disclose the written report to opposing counsel shall preclude the expert's testimony at trial." Crim.R. 16(K). However, only the opinion exceeding the scope of a supplied report is subject to exclusion under the rule. *See Boaston* at ¶ 58.

{¶79} Notably, a fact witness is not necessarily being called to testify as an expert witness because he has expertise in a certain field. *State v. Rydarowicz*, 2023-Ohio-916, ¶ 53 (7th Dist.). The rules allow "treating physicians to render opinions based upon their

personal observations and perceptions." *Id.* at ¶ 54. "It is well established that a treating medical professional may be called at trial to testify as an observer of a patients' physical condition and not as an expert retained in anticipation of litigation." *Id.*, quoting *State v. Reed*, 2021-Ohio-858, ¶ 30 (5th Dist.).

**{¶80}** "The Ohio Supreme Court has accepted the trend toward allowing lay witnesses to express their opinions in areas in which it would ordinarily be expected that an expert must be qualified under Evid.R. 702." *State v. Baker*, 2020-Ohio-7023, ¶ 35 (7th Dist.), citing *State v. McKee*, 91 Ohio St.3d 292, 296 (2001). Lay opinion based on personal knowledge and experience can fall within Evid.R. 701, even on a subject outside the realm of common knowledge. *McKee* at 296-297, citing Evid.R. 701 ("If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.").

**{¶81}** Furthermore, the expert report requirement is satisfied where other discovery evidence indicating the content of the testimony was provided to the defense in a timely manner. *See Rydarowicz* at ¶ 58, citing *State v. Heller*, 2019-Ohio-4722, ¶ 8 (9th Dist.) (the treating physician from a children's hospital, who was testifying about the injuries she observed as a fact witness, was permitted to testify the injuries appeared non-accidental without having provided an expert report to the defense where the physician's conclusion was consistent with the medical records); *State v. Blue*, 2021-Ohio-1703, ¶ 56 (5th Dist.), citing *State v. Allenbaugh*, 2020-Ohio-68, ¶ 36 (11th Dist.), citing *State v. Fetty*, 2012-Ohio-6127 (11th Dist.) (the medical records, in lieu of an expert report, adequately provided the requesting party with necessary information).

**{¶82}** Even if a treating physician's conclusion is considered to have ventured into the realm of expert opinion that should have been specifically added to the disclosed medical report, the alleged error is considered harmless where the defense was not taken by surprise and the ability to cross-examine the witness was not obstructed. *See Rydarowicz* at ¶ 58, 62; *Heller*, 2019-Ohio-4722, ¶ 10. In other words, Crim.R. 16 does not prohibit the reviewing court from conducting a harmless error analysis. *Boaston,* 2020-Ohio-1061, at ¶ 59-71 (finding the coroner's lacking disclosures harmless).

**{¶83}** Appellant argues certain portions of the physician's testimony violated the discovery rule in Crim.R. 16(K). The state points out the physician was disclosed as a state witness and the medical records and report she signed as the supervising physician were provided in discovery as well. As part of her function at the center, she considered the medical history learned and gleaned during the interview, reviewed the test propriety and results, viewed the vaginal images during a virtual examination, and signed a medical report, which was disclosed in discovery along with the underlying medical documentation and records. The physician was an expert in her field and was a fact witness as the supervising and examining physician at the child advocacy center.

**{¶84}** The state also emphasizes how the defense opened the door to the prosecution eliciting rebuttal evidence from the physician on the question of whether the lack of physical evidence or the existence of a child's hymen shows a lack of sexual conduct, particularly vaginal penetration. In opening statements, defense counsel presented the theory that the victim made false accusations in text messages as a form of "currency" to receive attention, including from friend 2 whose texts were viewed as pressuring the victim to answer questions about her situation. (Tr. 195). Concluding the text disclosures were the product of a troubled child with a need to "play the victim with her girlfriend," the defense declared the victim's initial vague report on inappropriate "touching" would be the only evidence, emphasizing the victim once recanted the initial report. (Tr. 195-196, 199). Defense counsel also stated:

> By the way, you will not hear any doctor say that there's any physical evidence of anything. You will probably hear a doctor say, "Well, that doesn't matter. It doesn't prove anything." But this is a matter of common sense. She was sent to a physical evaluation in Pittsburgh, a clinic that specializes in this, where she was examined head-to-toe under a microscope, and there were no findings, no physical findings except for things that were natural variations, not evidence of injury at all . . . The bottom line is the state is promising you they're going to prove this occurred beyond a reasonable doubt, **and the physical evidence will show that it did not happen**.

(Emphasis added.) (Tr. 197-199).

{¶85} When the state called the physician to the stand, defense counsel had no objection to her qualifications as an expert in the field of child sexual abuse. While acknowledging the defense knew she would be testifying as a fact witness as the supervising or treating physician, counsel objected to her "rendering any expert opinion that is an opinion outside of the evidence in this case" because the defense did not receive a specific expert report separate from the medical report and underlying medical documentation. (Tr. 438-440). We must point out the precise documents disclosed in discovery and their myriad contents are not part of the trial record before this court.

{¶86} The state argued the witness, the medical report, and the related medical items were timely disclosed. Additionally, the state argued the defense's opening statement opened the door to rebuttal testimony on the concept that "it's normal to be normal and the lack of physical evidence doesn't indicate a lack of abuse." (Tr. 440, 442-443).

{¶87} Defense counsel stated, "if the testimony is limited to rebutting the idea that since there's no physical evidence, it means that no abuse happened, I don't even object to that because I knew she was going to say that . . . I think she could testify that the lack of physical evidence doesn't necessarily mean this did not happen." At the same time, he insisted the physician should be prohibited from mentioning other cases or everything she knows as an expert, arguing this would exceed the scope of the medical records and report provided in discovery. (Tr. 441). He gave examples of what he may have retained a defense expert to say about an expert's "general statements about what some childhood rape victims say, or why they disclose or why they delay disclosure, or why they sometimes don't have physical injuries."

{¶88} As to the last example in the quote, *which is the topic at issue here*, defense counsel then recognized the state's disclosure claim or rebuttal right by stating, "And I'm not even objecting to her saying what I just said, the last statement, that some physical injuries are not always present." (Tr. 444). The court instructed defense counsel to specify objections during the questioning if he believed the physician's testimony was crossing over the line counsel was alleging.

{¶89} On appeal, Appellant takes issue with the physician's answer to the question, "What would your reply be if someone stood in the courtroom and said that the

physical evidence would prove that no sexual assault happened?" After stating this would be a false statement, the physician gave the following explanation: "a normal exam does not exclude any type of sexual abuse, and that is based on both years of experience and, more importantly, medical literature that supports that is what we term, it is normal to be normal. There are numerous reasons that ninety-five percent of the exams that we do are normal." Notably, there was no objection here on the basis of the scope of the report; and, the ground for the objection *prior to the state's question* was, "Just the form of the question." (Tr. 464-465).

**{¶90}** Appellant also cites to the following statements in the physician's testimony: a person's "hymen can still be intact" after vaginal sexual penetration; there is no virginity test; the concept of "popping the cherry" is a myth; and a twelve-year-old girl's vagina stretches and heals. (Tr. 469-473, 482-486).[1] Appellant ignores the fact that at trial, *defense counsel acknowledged the state could elicit testimony that the lack of physical findings regarding the child's hymen did not indicate a lack of sexual conduct and said the witness could be asked about her personal experience when explaining the presence of a hymen in someone who claims to be sexually assaulted.* (Tr. 444, 471).

**{¶91}** The physician's testimony on a hymen is part of her expected function as the supervising physician at a child advocacy center who is testifying as to her examination of the child's vagina and the resulting findings, which were said to be provided in the medical report she signed. It was conceded the defense was aware the physician would testify a non-torn hymen did not demonstrate a lack of penetration.

**{¶92}** Appellant also points to the physician's answer when the state asked, "Can you back up your last statement that it's normal to be normal, through . . . your personal experience as a practicing physician in this field, your education or study, or any other data?" The physician answered that she could share her experience "[b]ut medicine needs to be evidence driven and so" at which point defense counsel objected. Counsel opined the answer would go too far into the territory of a general expert opinion, the state replied it was part of the rebuttal to the opening statement, and the court overruled the objection. (Tr. 465).

---

[1] The victim's mother had been asserting that the child advocacy center's examination showed the child was still a virgin and claimed she consulted with a gynecologist who could administer a virginity test.

**{¶93}** The physician then testified about studies in medical literature that support her experience that 95% of their clinic's exams are "normal" as to the physical findings. (Tr. 466-468). A factual witness, who happens to be an expert, can explain that their experience (on lacking physical evidence in a child sex abuse case) is confirmed by studies they read, at least where the defense suggested the lack of physical evidence was a "common sense" factor favorable to Appellant and broadly declared this demonstrated the lack of sexual abuse. Counsel knew the opinions held by the physician due to the disclosure of the medical report she signed and the recorded phone conversation between the physician and the victim's mother, which the defense reviewed (and then specifically informed the court that there would be no objection to the relevant portions delineated by the parties prior to the playing of the call for the jury). And again, the opening statement by the defense started down this path by declaring, "the physical evidence will show that it did not happen." (Tr. 199).

**{¶94}** Even assuming arguendo, the review of the results of specific studies leaned toward expert opinion to be disclosed separately from or distinctly within the treating physician's medical report, the studies mentioned did not constitute the main portion of her testimony or of the state's case against Appellant, and their review by the physician would be considered harmless under Crim.R. 52(A). An error is harmless and not reversible unless *all* of the following items are established: (1) prejudice; (2) the court finds the error is not harmless beyond a reasonable doubt; and (3) the remaining evidence, after excising the prejudicial error, does not establish guilt beyond a reasonable doubt. *State v. Harris*, 2015-Ohio-166, ¶ 37

**{¶95}** Lastly, Appellant points to the physician's testimony that she would not expect to recover DNA evidence due to the passing of time since that last exposure to the accused, which is why a rape kit was not performed. (Tr. 476-482). A rape kit would have required the insertion of objects into the child's various orifices for swabbing, as opposed to their decision to use the colposcope for magnifying, which simply required the spreading of legs. As the trial court ruled, the explanation on the passing of time was part of the factual reasons for performing or not performing DNA swabs during the examination of the victim at issue. (Tr. 476). This is expected testimony from an examining/supervising physician testifying about the treatment of the victim during the

examination, especially where the defense's opening statement emphasized the lack of physical evidence and its ramifications.  This assignment of error is overruled.

ASSIGNMENT OF ERROR FOUR

**{¶96}** Appellant's fourth assignment of error contends:

"The Trial Court committed prejudicial error by allowing the State to call [the victim's mother] as a prosecuting witness to elicit a claim of privilege against self-incrimination and thereby deprived Appellant of his right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution."

**{¶97}** Appellant points out the parties knew the victim's mother would not be testifying.  Before trial, she filed a motion to quash the subpoena based on spousal privilege and the privilege against self-incrimination.  She was represented by counsel, and the court was in agreement that she would not be testifying.  When the state announced this witness' attorney had arrived and the state would be calling her next, defense counsel agreed the jury could be instructed the witness would not be testifying because she invoked the Fifth Amendment; however, the defense objected to calling her to the stand in front of the jury to assert her right.  (Tr. 359-360).

**{¶98}** It was claimed the "optics" of this procedure would be unfairly prejudicial to the defense.  (Tr. 360, 363).  The court pointed out the parties agreed there was no case prohibiting this procedure as long as the state did not continue to examine the witness after her successful invocation of privilege.  (Tr. 364-366).  The defense acknowledged the issue was a matter for the court's discretion and alternatively sought a limiting instruction ordering the jury to refrain from inferring anything from the witness's refusal to testify.  (Tr. 363, 366).  The court overruled the objection and granted the limiting instruction.

**{¶99}** When the victim's mother was called to the stand, the prosecutor asked her name and then asked if she intended to plead the Fifth Amendment right against self-incrimination in response to any additional questions he may ask her.  The witness responded in the affirmative, and the court immediately made the following announcement:  "The witness, having invoked her right under the Fifth Amendment, is

hereby excused. Okay. The Jury will not consider her invocation of that Constitutional right for any purpose." (Tr. 369).

{¶100} Appellant claims the state followed this procedure in order to generate an adverse inference against Appellant. He notes how the state placed the victim's mother in a negative light by the evidence indicating she did not believe her child's allegations. The state points out any negative inference would have resulted from the victim's testimony about feeling unsupported by her mother, as opposed to being the result of the jury watching the mother exercise her Fifth Amendment right from the stand. As the defense agreed there would be no issue if the court informed the jury the mother would not be testifying because she exercised her right against self-incrimination, it is difficult to discern the prejudice of having the jury watch the seconds-long placing of the assertion on the record.

{¶101} In any event, as the state points out, the case cited by Appellant does not support his argument on appeal. In the cited case, the Supreme Court held:

> In a criminal case, where a claim of a witness that he cannot be compelled to testify as a witness because of the privilege of immunity from self-incrimination is properly established, it is error prejudicial to the defendant for the court to permit counsel for the state, *by continued questioning of the witness*, which questions go unanswered, to get before the jury innuendoes and inferences of facts, conditions and circumstances which the state could not get before the jury by direct testimony of the witness.

(Emphasis added.) *State v. Dinsio*, 176 Ohio St. 460 (1964), syllabus.

{¶102} The Court discussed various positions in different courts, but then adopted the following position: "A witness, even though he has previously indicated that he will refuse to testify on the ground that to do so would incriminate him, may be called as a witness . . . The possibility that a witness may claim the privilege does not prohibit the prosecutor from asking questions." *Id.* at 466. The Court thus found, "There is no error in this case in the prosecutor's calling of the witness or in the first series of questions which the prosecutor asked and which elicited from the witness the claim of privilege and a refusal to testify." *Id.* The only error was the prosecution's repeated questioning while using proposed evidence that it could not otherwise interject into the record. *Id.* at 468.

Case No. 24 JE 0001

{¶103} Here, the state merely asked the witness her name and whether she was pleading the Fifth Amendment. This was specifically described as acceptable in *Dinsio*. *Id.* at 466. Accordingly, no error occurred by leaving the jury in the courtroom while the witness was called to the stand. This was made clear in a more recent case as well, where the Supreme Court observed, "Appellant argues that *Dinsio* stands for the proposition that a witness may not be questioned merely to elicit an assertion of his Fifth Amendment privilege. However, that is not the holding of *Dinsio*." *City of Columbus v. Cooper*, 49 Ohio St.3d 42, 45 (1990). "*Dinsio* does not preclude questioning which may elicit the assertion of the Fifth Amendment privilege, but merely repeated questioning where reassertion of the privilege is assured." *Id.* The Supreme Court also specifically rejected the defendant's argument that the calling of a witness at trial merely to have the privilege asserted on the stand was erroneous if the privilege was already established in an earlier proceeding, as "the mere questioning of a witness which elicits the assertion of the Fifth Amendment privilege is not error." *Id.* Accordingly, this assignment of error is without merit.

ASSIGNMENT OF ERROR FIVE

{¶104} Appellant's fifth assignment of error contends:

"The Trial Court committed reversible error by prohibiting the defense from cross-examining a key witness about her relationship with the alleged victim in violation of Appellant's rights of confrontation, to present a defense, and to due process of law as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶105} When the defense was cross-examining friend 2 about the texts recovered from her phone, the state objected to in-depth questioning on the nature of their relationship at a side bar. When the state mentioned the rape shield law, defense counsel said he would not ask about sexual relations, and the court agreed the law dealt with a victim's prior sexual activities. *See* R.C. 2907.02(D); (Tr. 342-344, 350). The state then argued the topic of whether they were girlfriends was irrelevant and slanderous for the preteens. The prosecutor also said if defense counsel delved into the victim's same sex romantic relationship when she was twelve years old (or less), then the state would

counter with evidence on the ways that sexually abused children act out and present testimony the victim subsequently had a boyfriend.

{¶106} Defense counsel said the existence of a romantic relationship between the middle-schoolers was relevant to the friend's possible jealousy, to the question of why she kept "digging for answers," and to Appellant's theory that the victim saw her victimhood as a form of "currency" (for which she received attention or gifts). (Tr. 342). The court asked why the friend's motive for asking important questions or how the specifics of the relationship would relate to credibility. (Tr. 345). The court then instructed defense counsel to refrain from delving into whether the victim was gay. Counsel asked if he could inquire whether the friend cared about the victim, and the court agreed. (Tr. 347).

{¶107} After this side bar, defense counsel asked friend 2, "So you and [the victim] were close friends at the time you had this conversation, correct?" The child answered in the affirmative and said they talked every day (sometimes at school); she also noted the only time she was at the victim's house was for a birthday party. (Tr. 351-354). Counsel further inquired, "the nature of your relationship was, you were talking every day, you were close friends. She couldn't just not answer you, right?" When friend 2 replied, "She could if she wanted to," counsel asked, "But you would have pushed her the way you did in these questions?" The friend testified, "I guess, yeah." (Tr. 351).

{¶108} On appeal, Appellant claims the trial court's ruling unconstitutionally constrained his right to present a defense and confront witnesses, citing *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (the criminal defendant has the constitutional right to be given a meaningful opportunity to present a complete defense under the due process, compulsory process, and/or confrontation clauses). "Cross-examination shall be permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." Evid.R. 611(A). We review de novo the denial of a defendant's opportunity to establish a witness' motive to lie so as to infringe on the Sixth Amendment right to confrontation; however, if cross-

examination on a claimed motive to lie is permitted, the question of "how much opportunity" defense counsel is granted is a question within the trial court's sound discretion. *McKelton*, 2016-Ohio-5735, at ¶ 172.

**{¶109}** Appellant's argument is without merit, as the court's limitation did not deny him a *meaningful opportunity* to present a complete defense by attacking the credibility of the disclosures. Initially, we point out the defense opted for a strategy of declining to cross-examine the victim after she testified on direct examination. We also note the jury heard Appellant's interview during which he said the victim and her friends were "gay" while noting he took her phone away after seeing the victim told her girlfriend she loved her. In addition, we emphasize the jury viewed the texts wherein friend 2 called the victim "Baby" and they spoke of missing each other with heart emojis. The texts additionally showed friend 2 labeled the victim in her contacts as "My Love" under a heart (profile picture). Most notably, prior to the questioning recited above, f*riend 2 had already answered in the affirmative* when asked the following question, "Now, at the time that these messages were sent and received, you were in a relationship with [the victim], right?" (Tr. 341).

**{¶110}** The question at issue was therefore asked and answered. In accordance, Appellant's rights to present a defense and to cross-examine witnesses were not unconstitutionally restricted by the court's decision that counsel should not further delve into the romantic aspects of the relationship between the victim (when she was eleven or twelve years old) and her schoolmate. This assignment of error is overruled.

ASSIGNMENT OF ERROR SIX

**{¶111}** Appellant's sixth assignment of error alleges:

"The Appellant was denied the effective assistance of counsel, contrary to his rights guaranteed by the Sixth and Fourteenth Amendments of the United States Constitution and Section 10, Article I, of the Ohio Constitution."

**{¶112}** A claim of ineffective assistance of counsel requires a showing of both deficient performance and resulting prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). If the performance was not deficient, then there is no need to review for prejudice and vice versa. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶113} In evaluating an alleged deficiency in performance, the reviewing court asks whether there was "a substantial violation of any of defense counsel's essential duties to his client" so that "counsel's representation fell below an objective standard of reasonableness." *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), citing *Strickland* at 687-688. Our review is highly deferential to counsel's decisions as there are "countless ways to provide effective assistance in any given case" and there is a strong presumption counsel's conduct was within the wide range of reasonable professional assistance. *Id.* at 142, citing *Strickland* at 689. A reviewing court should refrain from second-guessing the strategic decisions of counsel. *State v. Carter*, 72 Ohio St.3d 545, 558 (1995).

{¶114} On the prejudice prong, the defendant must demonstrate there is a reasonable probability the result of the proceedings would have been different but for the serious error committed by counsel. *Id.* at 557-558. Prejudice from defective representation justifies reversal only where the results were unreliable, or the proceeding was fundamentally unfair due to the performance of trial counsel. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993). Lesser tests of prejudice have been rejected: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Bradley* at 142, fn. 1, quoting *Strickland* at 693.

{¶115} First, Appellant says trial counsel was ineffective by failing to object to certain items addressed in assignments of error one or two. He summarily lists these items here and invokes the arguments already set forth in the prior assignments of error. Accordingly, these ineffective assistance of counsel arguments were relocated and addressed within the first or second assignments of error.

{¶116} Second, Appellant argues defense counsel should have retained a medical expert to refute the testimony of the child advocacy center physician. In support, he utilizes the following quote: "Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both." *Harrington v. Richter*, 562 U.S. 86, 106 (2011). However, the Court then applied *Strickland's* presumption of reasonable assistance by counsel and additionally found no prejudice for failing to call a defense expert in that case. *Id.* at 106-113. "In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Id.*

**{¶117}** The state says counsel was well prepared and put on a vigorous defense, including by precluding the state from introducing other acts evidence regarding claims that Appellant sexually abused the sister of the victim's mother when she was a similar age and living with them. As the state points out, it is well settled in the medical community that a normal physical examination does not rule out sexual assault, including vaginal penetration. *See, e.g., State v. B.J.T.*, 2019-Ohio-1049, ¶ 18 (12th Dist.) ("It is well-established that medical testimony is not necessary to prove a sexual assault and, oftentimes, victims will have no symptoms of physical injury . . . the fact that a victim's medical exam was 'normal' is not determinative of whether she was sexually abused").

**{¶118}** The physician's testimony contained the following explanations: a hymen is a band of tissue with a natural hole in the center; a hymen is not the mythical sheet covering the vaginal opening that is necessarily "popped" on penetration; vaginal tissue stretches and heals quickly; and a normal examination does not show penetration did not occur and is a common finding in sexual assault cases. There is no indication the defense could have obtained an expert willing to rebut this testimony. Defense counsel reasonably dispensed with such a task and focused on cross-examining the supervising physician, who was board certified in pediatrics and experienced in her field. For instance, the defense elicited from this physician that there was no physical evidence showing a sexual assault (even if the lack of physical evidence does not prove the lack of sexual assault).

**{¶119}** Neither deficient performance nor prejudice is indicated by the failure to call a medical expert to claim, for instance, that the hymen would necessarily be damaged if penetration occurred. "*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense." *Harrington*, 562 U.S. at 111. This assignment of error is without merit.

ASSIGNMENT OF ERROR SEVEN

**{¶120}** Appellant's seventh assignment of error argues:

"The Trial Court committed plain error by admitting improper expert testimony about the veracity of the alleged victim in violation of the rules of evidence and Appellant's right to due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution."

**{¶121}** "Witnesses, whether experts or laymen, may not testify regarding their opinions on the credibility of other witnesses, because that infringes on the domain of the trier of fact." *State v. Knuff*, 2024-Ohio-902, ¶ 157. "An expert may not testify as to the expert's opinion of the veracity of the statements of a child declarant." *State v. Boston*, 46 Ohio St.3d 108 (1989), syllabus (finding the *objected to* error was not harmless where a physician opined the *non-testifying two-year-old child* had not fantasized her abuse or been programmed to make accusations and another physician opined the child was telling the truth when identifying her father). This does not preclude an expert's opinion testimony on whether there was sexual abuse. *Id.* at 128.

**{¶122}** The Supreme Court thereafter explained, "*Boston's* syllabus excludes expert testimony offering an opinion as to the truth of a child's statements (e.g., the child does or does not appear to be fantasizing or to have been programmed or is or is not truthful in accusing a particular person)." *State v. Stowers*, 81 Ohio St.3d 260, 262-263 (1998). However, the holding "does not proscribe testimony which is additional support for the truth of *the facts testified to* by the child, or which assists the fact finder in assessing the child's veracity." (Emphasis original.) *Id.* at 263. The *Stowers* Court therefore found a doctor's testimony did not violate *Boston* where she explained recantation or delayed disclosure is not uncommon in sexually abused children, concluding this information helped the jury make an educated determination rather than usurping the jury's role. *Id.*

**{¶123}** Appellant makes two arguments here while acknowledging a lack of objection to the trial court. First, Appellant takes issue with the physician's testimony that the victim appeared "too upset to talk" at the November 2022 child advocacy center interview[2] and "was anxious about the exam, but cooperative." (Tr. 454, 458-459). He notes the physician was asked if it appeared the child was enjoying the attention, and she responded in the negative. (Tr. 461). He says these answers represented a "backhand way" of implying the victim's demeanor was consistent with abuse.

**{¶124}** As the state points out, these were ordinary opinions of observation that even a lay witness could provide. *See* Evid.R. 701 (non-expert can provide opinion that

---

[2] The defense had previously elicited from the detective that although the child did not make a specific disclosure when interviewed in 2022, there were "red flags" during his interview and during the child advocacy center's interview. (Tr. 408).

is rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony or the determination of a fact in issue); *State v. Davis*, 2008-Ohio-2, ¶ 118-120 (where the Supreme Court held a lay witness' testimony that another witness was "very non-committal, very wishy washy" was not an improper description of demeanor just because it was relevant to evasiveness), citing *State v. Stojetz*, 84 Ohio St.3d 462, 463 (1999). In the latter case, the Court ruled it was proper to admit an opinion that the witness appeared "scared" and "not able to think." *Stojetz* at 463.

**{¶125}** A physician's testimony expressing general observations of a child's demeanor is not akin to a comment on veracity. *See, e.g., Stowers* at 263 (*Boston* does not proscribe testimony which assists the fact finder in assessing the child's veracity); *State v. Branch*, No. 00AP-1219 (10th Dist. May 24, 2001) (testimony that child was "pretty upset" and "stressed" did not violate the principle in *Boston*). The cited comments in the physician's testimony did not vouch for the child's credibility.

**{¶126}** Moreover, there was no objection, and defense counsel had a strategy of reinforcing the testimony that *the victim did not make disclosures during her interview*. As set forth above, plain error is a discretionary doctrine to be employed only with the utmost care in exceptional circumstances when required to avoid a manifest miscarriage of justice. *Noling*, 2002-Ohio-7044, at ¶ 62. To establish plain error, the defendant must demonstrate an error, the error must have been obvious, and the outcome of trial must have been affected. *Graham*, 2020-Ohio-6700, at ¶ 93; *Rogers*, 2015-Ohio-2459, ¶ 22 (only the last element, he must "demonstrate a reasonable probability that the error resulted in prejudice—the same deferential standard for reviewing ineffective assistance of counsel claims."). There is no obvious error or reasonable probability that the trial outcome was affected by the cited comments, which were not instances of veracity vouching in any event.

**{¶127}** Second, Appellant contends the admission of the phone call between the physician and the victim's mother allowed the jury to hear the physician "put her expert seal of approval on [the victim's] accusation and thus on her credibility." As discussed above, the physician informed the mother over the phone that contrary to the mother's declarations, the medical examination did not show the child was a virgin, there was no virginity test in existence, and the normal exam result did not disprove sexual activity.

These explanations were already presented in the physician's testimony before the call was played. Appellant does not specifically quote statements of alleged vouching from the call. Nevertheless, we note the physician told the mother the child's disclosures were important and she was gravely concerned for the child's safety due to the mother's suggestions that a lack of physical evidence indicates the child was lying. (St.Ex. 6). Still, the physician's comments did not rise to the level of an opinion on the child's truthfulness.

{¶128} Notably, defense counsel not only failed to object but also specifically declared he had no objection to the phone call being published to the jury. (Tr. 491). He was in agreement with the "relevant portion" of the call being played, which they limited by fast-forwarding through the conversation occurring before the mother was connected to the conference call and by stopping the recording prior to the mother's conversation with the detective about coming in for a meeting. (Tr. 491-493).

{¶129} During the subsequent admission of exhibits, defense counsel reiterated he had no objection to this phone call being admitted into evidence. (Tr. 554). This was a tactical decision. *See State v. Herns*, 2023-Ohio-4714, ¶ 62, 63, 72-73 (7th Dist.) (where we concluded improper vouching for a victim's veracity was an error flowing from the defense strategy, while also noting a court may find vouching harmless if the person who was vouched for testified at trial). Notably, the victim's mother (who did not testify upon pleading the Fifth Amendment) expressed statements in the phone call favorable to the defense. For instance, she told the physician she saw Appellant and her child together daily and never saw signs of abuse. She also referred to the positive way the victim acted around Appellant, suggested the victim was not telling the truth, and said the victim had been consistently asking to come home.

{¶130} The admission of the phone call with the victim's mother into evidence does not evince an obvious trial court error on the topic of credibility vouching, and reversible prejudice is not apparent in any event. This assignment of error is overruled.

ASSIGNMENT OF ERROR EIGHT

{¶131} Appellant's eighth assignment of error contends:

"The Trial Court erred and thereby deprived Appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling Appellant's Crim.R. 29

Case No. 24 JE 0001

motion for judgment of acquittal, as the State failed to offer sufficient evidence to prove each and every element of the charges beyond a reasonable doubt."

**{¶132}** The standard for reviewing the sufficiency of the evidence to support a criminal conviction on appeal is the same as the standard used to review the denial of a motion for acquittal. *See State v. Williams*, 74 Ohio St.3d 569, 576 (1996); Crim.R. 29(A) (motion for judgment of acquittal based on insufficient evidence). Whether the evidence is legally sufficient to sustain a conviction is a question of law dealing with adequacy. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

**{¶133}** If a conviction is not supported by sufficient evidence, the defendant cannot be retried as jeopardy attached. *Id.* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 41, 47 (1982). Because the remedy for reversible evidentiary error is a new trial, all evidence introduced by the state, including that erroneously admitted by the trial court, can be used in determining whether the evidence was sufficient to sustain the guilty verdict. *State v. Brewer*, 2009-Ohio-593, ¶ 16-20; *State v. Yarbrough*, 2002-Ohio-2126, ¶ 80, citing *Lockhart v. Nelson*, 488 U.S. 33, 35, 38, 40-42 (1988). In other words, the question is not whether the admissible evidence was sufficient but is whether the admitted evidence was sufficient. *Id.*

**{¶134}** In reviewing the sufficiency of the evidence, the court views the evidence, including reasonable inferences, in the light most favorable to the prosecution to ascertain whether "any" rational trier of fact could have found the elements of the offense proven beyond a reasonable doubt. *State v. Getsy*, 84 Ohio St.3d 180, 193 (1998), quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (consider all evidence in the light most favorable to the prosecution, including reasonable inferences); *State v. Filiaggi*, 86 Ohio St.3d 230, 247 (1999) (viewing reasonable inferences in favor of the state); *State v. Goff*, 82 Ohio St.3d 123, 138 (1998). Sufficiency involves the state's burden of production rather than its burden of persuasion. *Thompkins* at 390 (Cook, J., concurring).

**{¶135}** Appellant contends the law and the "factual discrepancies" show the state failed to prove his guilt beyond a reasonable doubt on all of the essential elements. Appellant was convicted of two counts of rape under R.C. 2907.02(A)(1)(b). This statute provides in pertinent part: "No person shall engage in sexual conduct with another who is not the spouse of the offender . . . when . . . The other person is less than thirteen years

of age, whether or not the offender knows the age of the other person." R.C. 2907.02(A)(1)(b). Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). "Penetration, however slight, is sufficient to complete vaginal or anal intercourse." *Id.*

{¶136} The testimony established Appellant was not the spouse of the victim, who was 12 years old when the second investigation began in September 2022. She explained why she recanted her first allegations of inappropriate touching, which she disclosed in a recorded interview played at trial. She confirmed she sent the texts received by friend 2 in the months after her December 2021 recantation. (Tr. 313). Regardless, the victim testified that a few weeks after Appellant moved back into her house (after her recantation), the sexual abuse by her stepdad resumed. (Tr. 299, 301). She testified he "forced" her to have sex more than once. (Tr. 310-311). Specifically, she testified to sexual conduct committed by Appellant against her when he put his penis into her vagina. She additionally testified to sexual conduct committed when Appellant put his penis in her mouth. (Tr. 304-305). "Sometimes" the sexual conduct occurred when her mother was away from the house, and "[s]ometimes" it occurred when her mother was in the shower. (Tr. 305).

{¶137} Even without considering various other pieces of evidence addressed in our Statement of the Case or under other assignments of error, some rational trier of fact could find the elements of sexual conduct with a child under the age of thirteen were proven beyond a reasonable doubt. As the evidence was sufficient to support the verdict of guilty on two counts of rape, this assignment of error is without merit. An evaluation of witness credibility is not involved in a sufficiency review, as the question is whether the evidence is sufficient if it is believed. *Yarbrough*, 2002-Ohio-2126, ¶, 82; *State v. Murphy*, 91 Ohio St.3d 516, 543 (2001). Arguments about the victim's credibility are therefore addressed in the next assignment of error.

ASSIGNMENT OF ERROR NINE

{¶138} Appellant's ninth and final assignment of error states:

"The Trial Court erred by finding Appellant guilty and thereby deprived Appellant of due process of law as guaranteed by provisions of the Ohio Constitution because the verdict of guilty was against the manifest weight of the evidence."

**{¶139}** Weight of the evidence concerns the effect of the evidence in inducing belief, and our review would evaluate "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other." *Thompkins*, 78 Ohio St.3d 380, 387. The appellate court considers whether the state met its burden of persuasion. *Id.* at 390 (Cook, J., concurring) (as opposed to the state's burden of production involved in a sufficiency review). When a defendant claims the conviction is contrary to the manifest weight of the evidence, the appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Lang*, 2011-Ohio-4215, ¶ 220, citing *Thompkins* at 387.

**{¶140}** The power of the court of appeals to sit as the "thirteenth juror" is limited in order to preserve the jury's role with respect to issues surrounding the credibility of witnesses and the weight of the evidence. *Thompkins* at 387, 389. "[T]he weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. Hunter*, 2011-Ohio-6524, ¶ 118, quoting *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.

**{¶141}** "We therefore generally proceed under the premise that when there are two fairly reasonable views of the evidence or two conflicting versions of events, neither of which is unbelievable, we do not choose which one we believe is more credible." *State v. Carter*, 2017-Ohio-7501, ¶ 105 (7th Dist.), citing *State v. Gore*, 131 Ohio App.3d 197, 201 (7th Dist. 1999). Notably, where a criminal case has been tried by a jury, only a unanimous appellate court can use its discretion to reverse on the ground that the verdict was against the manifest weight of the evidence. *Thompkins* at 389, citing Section 3(B)(3), Article IV of the Ohio Constitution.

**{¶142}** We incorporate our recitation of the evidence from our Statement of the Case and the other assignments of error, including our sufficiency review. The defense

theory that the victim made up a life of sexual abuse in order to gain attention, gifts, or relocation was not convincing and was not accepted by the jury. Contrary to Appellant's contention, there was no compelling evidence suggesting her friends persuaded her to lie; attempting to convince a friend to seek help for their unbearable situation, is not coaching.

{¶143} Moreover, the victim's initial recantation did not render her trial testimony unbelievable. The jury heard her explanation: every time her mother asked if her allegations were true or if she were lying, it seemed as if she wanted her to say they were not true. Additionally, Appellant's mother met with her and expressed she was upset because the allegations would put Appellant away for a long time. The victim explained she recanted because her allegations were negatively affecting everyone in her family.

{¶144} According to her testimony, Appellant resumed his sexual abuse not long after he was permitted to move back to their house. The lack of physical evidence during a medical examination conducted a month after Appellant was once again removed from the house is not a convincing argument for disbelieving the victim. She testified he put his penis in her mouth. She also testified he put his penis in her vagina and said he forced her to have sex more than once. The jury occupied the best position from which to weigh the evidence and judge witness credibility by observing gestures, voice inflection, and demeanor. *See Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). The record contains some indicia of the stress the victim was experiencing on the stand. The jury was able to watch her testify about her experience and see her tears and emotions. The jury was also able to evaluate the video of Appellant when he was interviewed by the detective. Upon reviewing the entire record, we conclude this is not the "exceptional case" where the jury "clearly lost" its path as it weighed the evidence and created a "manifest miscarriage of justice" so as to require a new trial. *See Lang*, 129 Ohio St.3d 512 at ¶ 220. This assignment of error is overruled.

{¶145} For the foregoing reasons, Appellant's convictions are upheld, and the trial court's judgment is affirmed.

Waite, J., concurs.

Dickey, J., concurs.

Case No. 24 JE 0001

[Cite as *State v. Martin*, 2024-Ohio-5332.]

---

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas of Jefferson County, Ohio, is affirmed.  Costs to be taxed against the Appellant.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**